UNITED STATES, Appellee,

v.

Darryl S. JACOBS, Senior Airman, U.S. Air Force, Appellant.

No. 63,087.
ACM 27140.

U.S. Court of Military Appeals.

Argued March 6, 1990.

Decided Sept. 25, 1990.

For Appellant: *Captain Paul M. Dankovich* (argued); *Colonel Richard F. O'Hair* (on brief).

For Appellee: *Captain Morris D. Davis* (argued); *Colonel Robert E. Giovagnoni* (on brief); *Colonel Joe R. Lamport, Major Terry M. Petrie, Major Paul H. Blackwell, Jr.*

Amicus Curiae: For reversal—St. Mary's University School of Law Board of Advocates: Roderick Regan and Phillip McClure (argued); Melinda Davis, Jerry J. Jarzombek, Fred Leon III, Sara Murray, Timothy Myer, David Surratt, Law Students, and David A. Schlueter, Esq., Professor of Law (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

During June of 1988, appellant was tried by a general court-martial with members at Beale Air Force Base, California. In accordance with his pleas he was found guilty of willfully damaging military property, wrongfully disposing of military property, nine specifications of larceny of both private and government property, and wrongfully opening mail matter, in violation of Articles 108, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 908, 921, and 934, respectively. The officer members sentenced appellant to a dishonorable discharge, confinement for 18 years, total forfeitures, and reduction to airman basic. The convening authority approved the sentence except for confinement exceeding 6 years. The Court of Military Review affirmed the findings of guilty and sentence in an unpublished opinion dated May 16, 1989, 1989 WL 79187.

This Court granted review on the following question of law:

> WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT HELD THAT *ARIZONA v. HICKS*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), DID NOT APPLY.

We hold that the Court of Military Review did not err in this regard or in affirming the judge's ruling admitting evidence seized from appellant's off-base apartment.

Appellant entered conditional pleas of guilty in this case. Under RCM 910(a)(2), Manual for Courts–Martial, United States, 1984, and with the consent of the Government, he reserved the right to appellate review of an adverse ruling on his pretrial motion to suppress evidence seized from his off-base residence. The granted issue questions the correctness of the opinion below affirming this ruling.

The military judge at trial denied several pretrial motions by the defense to suppress evidence, including one based on an "illegal entry and search of the accused's residence by United States Air Force Personnel." He said:

Counsel, I have before me two defense motions. The first motion is to suppress the admissibility or exclude unnamed property that was seized in the accused's apartment. In resolving this issue, I have made findings of fact and conclusions of law.

I find that the accused's residence was located at 719 H Street, Number B, Marysville, California; that the accused rented the premises on a month-to-month basis from Mr. and Mrs. Don Fredell; that during the latter part of December 1987, the accused took leave for approximately one month to Virginia. The landlord, Mr. Fredell, was aware of the accused's absence. That during the accused's absence, an Airman Bills, a fellow Security Policeman, occupied the premises. The landlord was unaware of any specific permission for Bills to reside in the apartment, but was aware a military person was coming and going from the apartment. That on or about the 14th of January 1988, the landlord entered the accused's apartment without notification to the accused. The landlord did not know how to notify the accused, and it was necessary to effect emergency plumbing repairs. Upon entry, he found the apartment in great disarray with spoiled foods, opened foods, in his words "trashed." That from clothing he identified the current occupant as Bills. Concerned over the condition of his apartment and to ensure its proper repair, he called the Beale Air Force Base Law Enforcement desk. Eventually he ended up talking to Staff Sergeant Johnston, who was the accused's flight chief. That Staff Sergeant Johnston declined to be of assistance, but after Mr. Fredell's insistence including his threat to go directly to the base commander for assistance, Staff Sergeant Johnston capitulated, telling Mr. Fredell that it was not in any Air Force or official capacity, but he would look and, if necessary, counsel the accused or responsible parties to ensure the deficiencies were corrected. That the next day, off duty, while on a family outing, Staff Sergeant Johnston ap-

peared. After again ensuring Mr. Fredell that he was not in any official capacity, Staff Sergeant Johnston, with Mr. Fredell, entered the accused's apartment. The narrow question before the court as expressed by defense counsel is—was Staff Sergeant Johnston's entry the result of a private or governmental action sufficient to trigger M.R.E. 311 and Fourth Amendment protections. In my estimation, it goes without saying, that the accused had a legitimate right of privacy in the premises and had not abandoned it in allowing Bills to occupy the premises. Only law enforcement agencies acting solely in their capacity or those holding direct disciplinary control over an accused exercise that degree of governmental activity to—that is required to make such an entry or search official. In this case, Staff Sergeant Johnston, although in law enforcement, was off duty, had no suspicion of crimes having been committed, and was responding solely to ensure the complainant did not escalate his complaints. He was not responding as a law enforcement official.

The issue of whether Staff Sergeant Johnston was one holding direct disciplinary control over the accused is not so easily resolved. Staff Sergeant Johnston was senior in rank to the accused. He was the accused's flight chief and first indorser on his Airman Performance Report. He was also charged with supervisory duties over the accused while they were on shift. However, within the services, everyone is just about going to outrank someone. Not everyone who's senior in grade in the military exercises such control. Staff Sergeant Johnston himself was not empowered to discipline but to advise and inform those senior, somewhat as would any other senior NCO who was not at all related to the accused's duties.

During the totality of the circumstances of this case, I find that Staff Sergeant Johnston's response was because he was the flight chief but not as a flight chief. This reluctant response was solely to preclude the complaint of the irate landlord from escalating through command structures. As such, he was not there in an official capacity, and the motion to suppress is denied.

The Court of Military Review affirmed the judge's decision. It said:

Items of stolen property were discovered in the appellant's off base residence by Staff Sergeant (SSgt) Johnston, the appellant's flight chief and second line supervisor. SSgt Johnston had responded to an angry call from the appellant's landlord that the apartment, which had been left in the care of another airman in the appellant's absence on terminal leave, was in a "trashed" condition. SSgt Johnston, on entering the apartment, noted not only the unsightly condition the apartment was in but an electric typewriter in plain view on the floor. In looking around the apartment he noted various computer components and a television/video player sitting on the floor. He immediately suspected that these were items of stolen property. He recalled having seen reports of thefts of such property in the security police blotter and having subsequently reported on them at various guard mount formations. Although he did not articulate it, he was also undoubtedly aware that the appellant, who performed base patrol duties, would have had an opportunity to pilfer government property if he were so inclined. *He copied several serial numbers, also in plain view according to his testimony, and verified his suspicion later that day.* A subsequent search and seizure were conducted based on this information.

We find that SSgt Johnston was lawfully on the appellant's premises at the invitation (indeed, the insistence) of the landlord, an individual who was authorized to grant him access under the circumstances at hand. *See generally United States v. Clow,* 26 MJ 176 (CMA 1988), which is partially distinguishable in that authorities therein were on the accused's premises for a clearly defined

criminal investigative purpose. We do not agree with appellate defense counsel that SSgt Johnston's actions in copying down the serial numbers of certain items of property constituted a warrantless search of the type condemned by the Supreme Court in *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

While *Hicks* establishes important principles for investigators and practitioners, it describes a peculiar factual scenario which is materially distinct from the situation before us. For instance, in *Hicks,* police who responded to the scene of a reported shooting incident became suspicious upon noticing expensive stereo components on the premises. They believed that the equipment appeared to be out of place in a "squalid and otherwise ill-appointed" environment. 480 U.S. at 323 [107 S.Ct. at 1152]. We conclude that SSgt Johnston's suspicions rested on a much firmer basis. *Another important distinction between the instant situation and Hicks is in SSgt Johnston's testimony that the serial numbers he copied were in plain view.* In *Hicks,* the testifying officer stated that it was necessary that he move several items of equipment so that he might view serial numbers for the purpose of obtaining information for identification purposes. *See* the Court's discussion of the Fourth Amendment implications of this testimony. 480 U.S. at 324–325 [107 S.Ct. at 1152–53].

Based on the analysis set forth above, we conclude that the military judge properly denied the motion to suppress the fruits of the search that was subsequently conducted based on information furnished by SSgt Johnston. We also conclude that the military judge properly denied the motion to suppress the appellant's oral admissions. *United States v. Collier,* 1 MJ 358 (CMA 1976).

Unpub. op. at 2–3 (emphasis added).

The challenged pieces of evidence in this case were the stolen items seized from appellant's off-base apartment by civilian police pursuant to a civilian search warrant. This search warrant was based on an affidavit obtained from appellant's flight commander, Sergeant Johnston. The affidavit included an assertion that the serial numbers which he copied from items in appellant's apartment matched the numbers of items on an Air Force stolen-property report. Appellant and Sergeant Johnston both were members of a military police squadron.

## I

It is "conceded" by appellate defense counsel "that SSgt Johnston went to ... appellant's apartment in a private capacity" at the request of the complex's landlord. Nevertheless, he now contends that Sergeant Johnston's capacity became official on entering the apartment and prior to his acquiring the information on which the challenged warrant was based. Moreover, he claims that Sergeant Johnston's purported action in moving the stolen items to see and record their serial numbers was an unlawful search and seizure prohibited by the Fourth Amendment as applied in *Arizona v. Hicks, supra.* Finally, he asserts that this illegal search and seizure invalidated the subsequently obtained civilian warrant.

The defense's argument before this Court clearly rests on the Supreme Court decision in *Arizona v. Hicks, supra.* We note, however, that civilian defense counsel did not make this particular argument at appellant's court-martial. Instead, he rested his search-and-seizure claim on *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), and *United States v. Warner,* 843 F.2d 401 (9th Cir. 1988). He contended that Sergeant Johnston was a government official whose entry into appellant's apartment, even with the consent of the landlord, violated the Fourth Amendment. The military judge rejected this particular search-and-seizure argument because he concluded that Sergeant Johnston was acting in a private capacity when he entered the apartment and discovered the suspected stolen items.

*See United States v. Portt*, 21 MJ 333 (CMA 1986); *United States v. Volante*, 4 USCMA 689, 16 CMR 263 (1954). Accordingly, he concluded that Fourth. Amendment strictures did not apply to Sergeant Johnston's actions in this case. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

Before the Court of Military Review, military appellate counsel proffered a different official-action argument from the one made by civilian defense counsel at this court-martial. As noted above, he conceded that Sergeant Johnston came to appellant's apartment in a non-governmental capacity. However, he asserted that Sergeant Johnston's status changed when he entered the apartment, saw the suspected items, and began acting like a police officer investigating a crime. He relied heavily on this Court's decision in *United States v. Duga*, 10 MJ 206 (CMA 1981), for his motivational approach to the governmental-capacity question. Accordingly, he argued that the military judge erred in denying the defense suppression motion simply on the basis of Sergeant Johnston's private capacity in entering the apartment.

Appellate counsel at this time also raised an additional search-and-seizure claim based on *Arizona v. Hicks, supra*. He asserted that "Sergeant Johnston *must* have handled" or "juggled" or "turned" or "tilted" or "moved" these items to see and record their serial numbers. Such conduct, he asserts, was a search under *Arizona v. Hicks, supra*, requiring probable cause which did not exist in this case.

The Court of Military Review rejected both these arguments. Relying on *United States v. Clow, supra*, it stated that Sergeant Johnston was lawfully on appellant's premises at the insistence of the landlord for non-criminal investigative purposes. Furthermore, relying on *Arizona v. Hicks, supra*, it stated that the serial numbers in this case "were in plain view" and did not require movement to be recorded. Finally, it held that Sergeant Johnston had more than mere suspicion that the items he observed were stolen. Unpub. op. at 2.

Before this Court, appellate counsel now asserts that the Court of Military Review implied in its decision that Sergeant Johnston was acting in a governmental capacity. He notes that the judge reached a different conclusion on this question. Yet, he does not pursue the earlier contention made at trial that a landlord could not lawfully consent to such an entry by such an official into his tenant's apartment. *See Chapman v. United States, supra*. Instead, appellate counsel focuses on the *Arizona v. Hicks, supra*, argument as previously described. He also requests a *DuBay*[1] hearing to support his claim. Several distinct questions arise in this context.

## II

A preliminary question we must consider in this case is whether Sergeant Johnston was acting in an official or governmental[2] capacity when he entered appellant's apartment. *See generally United States v. Volante, supra*. The military judge concluded that his action was private in nature. *See United States v. Portt, supra*. The Court of Military Review's opinion implied his conduct was official but nonetheless found it was authorized under the circumstances of this case.

■ We agree with the Court of Military Review, despite Sergeant Johnston's disclaimers of officiality, his failure to wear a uniform, and the off-duty occurrence of his action. He admitted that he intended to brief his commander and counsel his subor-

---

**1.** *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).

**2.** Mil. R. Evid. 311(a), Manual for Courts–Martial, United States, 1984, speaks in terms of "governmental capacity," while this Court's opinion speaks in terms of "official capacity." Either description suffices to capture the concept of sovereign or governmental authority delineated in *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

dinate concerning damage to the apartment and necessary repairs. In this light, he was performing a routine command function in caring for his men which ultimately benefited the Air Force.[3] There was no simply private motivation for Sergeant Johnston's conduct which would place this case within the ambit of our earlier decisions. Such conduct is unquestionably official or governmental within the meaning of *United States v. Volante* and *United States v. Portt*, both *supra*. Accordingly, the Fourth Amendment applies in this case.

■ In this light, it is unnecessary to address appellate counsel's changed-motivation argument on officiality, which was purportedly drawn from *United States v. Duga, supra*. That case delineated the scope of official questioning for purposes of Article 31, UCMJ, 10 USC § 831, in light of the particular language of that statute. *Cf. United States v. Loukas*, 29 MJ 385 (CMA 1990). To some extent, however,

appellate counsel's argument on this point also suggests that the Fourth Amendment requires the inadvertent discovery of the serial numbers which were in plain view. This suggestion must be rejected. In *Horton v. California*, —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Supreme Court disowned the so-called inadvertent-discovery aspect of the plain-view doctrine.

### III

An additional threshold question in this case, which was not addressed by the military judge, is whether appellant's landlord could lawfully invite Sergeant Johnston to inspect appellant's apartment for the purpose of arranging necessary repairs. The Court of Military Review, relying on the decision of this Court in *United States v. Clow, supra*, held that the landlord lawfully authorized access for a non-law-enforcement purpose in this case. Both the lease agreement[4] and applicable California law[5]

---

3. Paragraph 7a(4), Air Force Regulation 39–6M, *The Enlisted Force Structure* (March 7, 1986), states:

> (c) Senior NCOs must be alert to detect adverse morale trends and provide feedback to commanders, immediate supervisors, officers, and staff chiefs. They must devote total effort in resolving the causes of any problem before it becomes a major issue. They must be available to counsel and provide guidance to their subordinates.
>
> (d) Senior NCOs must establish and maintain rapport and communication with subordinates to remain attuned to their needs. By personal example and leadership, they encourage and motivate both on and off duty involvement in unit activities.
>
> (e) Senior NCOs must ensure that enlisted members are treated fairly by all agencies and activities, both on and off base. The senior NCO must also ensure that those agencies and responsible personnel are informed whenever such principles are violated and uncorrected deficiencies are reported to appropriate officials.
>
> (f) The senior NCO must take the lead in achieving, maintaining, and enforcing Air Force standards, as well as good order and discipline.

Paragraph 7b(4) of AFR 39–6M provides:

> (4) Role and Use. NCOs are first-line supervisors. They must be used in positions that permit the use of both their supervisory and technical skills. They must, both on and off duty, demonstrate the exemplary attributes of dedicated professional NCOs by:

> (a) Ensuring that personnel and resources under their control are effectively used.
>
> (b) Remaining alert to detecting adverse morale trends and initiating corrective action within their control; and providing the appropriate feedback to superiors.
>
> (c) Maintaining the highest level of communication and rapport with subordinates, and remaining attuned to their needs.
>
> (d) Encouraging and motivating on and off duty involvement in unit-base activities by leading the way.
>
> (e) Ensuring that people are treated fairly by all agencies and activities, both on and off base; and initiating corrective action in any instance which violates this principle.
>
> (f) Wearing the uniform properly and ensuring compliance from subordinates.
>
> (g) Encouraging and promoting physical fitness participation by leading the way.

4. Appellant initially moved into Apartment A in an apartment complex at 719 H Street, Marysville, California. This complex consisted of apartments A, B, C, and D, and it was owned by Mr. Fredell. At that time he signed a rental agreement which provided:

> 12. Upon not less than 24 hours advance notice, Tenant shall make the demised premises available during normal business hours to Landlord or his authorized agent or representative, for the purpose of entering (a) to make necessary agreed repairs, decorations, alterations or improvements or to supply necessary or agreed services, and (b) to show the

permit a landlord and his agents to enter a tenant's apartment in his absence to make emergency repairs.

■ We agree with the implied finding of the court below that an emergency situation existed in this case. Evidence of record establishes that appellant's apartment was in a multiple unit complex, and it was producing an egregious "stink" or odor which was detectable in at least one other unit. Moreover, applicable California case law supports the conclusion that no Fourth Amendment violation occurs when a police officer enters a tenant's apartment in such circumstances at the behest of the landlord and discovers evidence of crime in plain view. *People v. Plane*, 274 Cal. App.2d 1, 78 Cal.Rptr. 528 (Cal.App. 1 Dist. 1969). *See People v. Thompson*, 25 Cal. App.3d 132, 101 Cal.Rptr. 683, 690 (Cal. App. 2 Dist.1972); *People v. Minervini*, 20 Cal.App.3d 832, 98 Cal.Rptr. 107, 111 (Cal. App. 2 Dist.1971); *People v. Henning*, 18 Cal.App.3d 872, 96 Cal.Rptr. 294, 296 (Cal. App. 1 Dist.1971). *See generally United States v. Sledge*, 650 F.2d 1075, 1080 n.10 (9th Cir.1981); *People v. Snyder*, 218 Cal.

App.3d 480, 266 Cal.Rptr. 915, 918 (Cal. App. 4 Dist.1990).

Such an entry is materially different from the situation presented in *Chapman v. United States, supra.* There, a landlord consented to entry of a tenant's apartment by the police to search for evidence of a crime. *Id.* 365 U.S. at 616, 81 S.Ct. at 779; *see United States v. Clow, supra* at 184. *See also Jones v. United States*, 357 U.S. 493, 500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). To establish valid consent for that purpose, the landlord or third party must have common authority or appear to have common authority over the premises which goes beyond a mere right to enter to make emergency repairs. *Chapman v. United States, supra; see Illinois v. Rodriguez*, — U.S. —, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S.Ct. 988, 993 n.7, 39 L.Ed.2d 242 (1974).[6] The same degree of authority in the landlord is not required when the police enter the apartment "in the shoes" of the landlord to assist him in making emergency repairs. *See United States v. Sledge, supra* at 1080 n.10.

premises to prospective or actual purchasers, mortgagees, tenants, workmen or contractors. *In an emergency, Landlord, his agent or authorized representative may enter the premises at any time without securing prior permission from Tenant for the purpose of making corrections or repairs to alleviate such emergency.*

He subsequently moved into Apartment B where the challenged search occurred. Appellant admitted that he signed no new paperwork and understood the original paperwork would apply with a different apartment letter to be inserted. Over defense objection, the military judge considered this agreement.

5. Cal. Civil Code § 1954 (West 1985), governing a landlord's right of access to a dwelling unit, states:

A Landlord may enter the dwelling unit only in the following cases:
(a) In case of emergency.
(b) To make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors.
(c) When the tenant has abandoned or surrendered the premises.

(d) Pursuant to court order.
Except in cases of emergency or when the tenant has abandoned or surrendered the premises, entry may not be made during other than normal business hours unless the tenant consents at the time of entry.
The landlord shall not abuse the right of access or use it to harass the tenant. Except in cases of emergency, when the tenant has abandoned or surrendered the premises, or if it is impracticable to do so, the landlord shall give the tenant reasonable notice of his intent to enter and enter only during normal business hours. Twenty-four hours shall be presumed to be reasonable notice in absence of evidence to the contrary.

6. *Chapman v. United States, supra*, has not been construed to invalidate consent by a landlord to search for criminal evidence in tenant areas in all circumstances. *See United States v. Gradowski*, 502 F.2d 563 (2d Cir.1974); *United States v. Wilson*, 472 F.2d 901 (9th Cir.1972), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973); *United States v. Gargiso*, 456 F.2d 584 (2d Cir.1972). *See generally United States v. Impink*, 728 F.2d 1228, 1232–34 (9th Cir.1984). *See also United States v. Echegoyen*, 799 F.2d 1271 (9th Cir.1986).

## IV

Turning finally to appellant's claim based on *Arizona v. Hicks, supra,* we hold that the court below was correct in rejecting it. As noted earlier, appellate counsel shifted the defense's position on appeal, and this newly assigned constitutional issue was not particularly raised or considered at trial. *See* Mil.R.Evid. 311(d)(3) and (e)(3), Manual *supra.* Thus, at the very least, we must reject his belated invitation to draw a favorable inference at this level that Sergeant Johnston moved the stolen items to see and record their serial numbers. *See United States v. Mitchell,* 783 F.2d 971, 975–78 (10th Cir.1986); *United States v. Whitten,* 706 F.2d 1000, 1011–12 (9th Cir.1983); *see generally* 4 W. La-Fave, *Search and Seizure* § 11.1(a) n.8 at 189 (2d ed.1987). *Cf. United States v. Hilton,* 27 MJ 323 (CMA 1989). Accordingly, his asserted factual basis for this legal claim is suspect.

More importantly, Sergeant Johnston unequivocally testified that the serial numbers were "in plain view," and such evidence is ample support for the Court of Military Review's similar finding of fact on this question. *See United States v. Phillips,* 30 MJ 1, 7 (CMA 1990). Circumstantial evidence suggesting a contrary conclusion cannot be considered dispositive in this situation. Moreover, a *DuBay* hearing, which has also been requested by appellate defense counsel to more particularly explore this testimony, is not warranted. Finally, we note that *Arizona v. Hicks, supra,* expressly holds that the act of observing and recording serial numbers on items which were not moved is not a search for Fourth Amendment purposes, so it does not require probable cause. *See also Horton v. California, supra.* Accordingly, the appellate court below did not err.

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COX concurs.

1. My analysis of the issues was aided immeasurably by the excellent *amicus curiae* brief and oral argument presented by the Student Board of Advocates of St. Mary's University School of Law, San Antonio, Texas, where this case was heard.

EVERETT, Chief Judge (dissenting):

My analysis [1] of the record of trial leaves me convinced that the Government's case derived from an unlawful search by Sergeant Johnston. Therefore, I must dissent.

## I

### A

Appellant was assigned to a security police squadron at Beale Air Force Base. He resided off-base in Marysville, California, with his wife and son in a two-bedroom apartment which he leased from Mr. Donald Fredell. There was a written lease which gave no right for the landlord to enter the premises without appellant's permission except in an emergency.

Mr. Fredell called the desk sergeant at the security police squadron to complain about damage to the apartment. The desk sergeant referred the complaint to Staff Sergeant Johnston, who was appellant's flight chief and also was a security policeman. According to Johnston, Mr. Fredell asked

that somebody come out and take a look at the apartment because the apartment was trashed in his words, and he wanted somebody from the Air Force to come out and take a look at it and the damage. I told him as far as any damage, the Air Force cannot be represented, but being somebody that works for me, I would come out and take a look at it so we can brief the commander and talk to the individuals concerned and have them make restitution or clean the apartment up to his satisfaction.

Since Sergeant Johnston was "the senior person" over Jacobs, he had felt that it would be best for him to go off-base to appellant's apartment, rather than to have someone else do so. It was his intention to view the premises and then to brief the commander on what he had seen. Also, it was his "intention to counsel the individual

or individuals that were responsible" for any damage. This counseling of his subordinates would be "that they would make restitution and repairs suitable to the landlord"; and it was his "feeling that that would be their legal responsibility to make restitution."

The impetus behind Sergeant Johnston's decision to go to the apartment became clearer after Mr. Fredell had testified. Mr. Fredell recited that, after he had noticed a stench in the apartment, he had called the "Beale Air Force Base Police Department." He did not know where appellant worked. "I just wanted to get some action going on." At first, Sergeant Johnston "didn't want to come out. And I could see that all he was doing was getting me a lot hotter than I was. And finally after I said a couple things to him, he felt that he probably should come out."

On cross-examination, Mr. Fredell clarified how he had caused Sergeant Johnston to change his mind. *"I told him that my wife knew the commander's wife and that if he didn't want to, you know, come take a look at things, I could go over the top of his head and try to get something done at that point,* cause I was getting mad at that point. They did not want to come out." (Emphasis added.) However, after Mr. Fredell *"mentioned this connection with the base commander's wife,"* Sergeant Johnston "told me he'd be out in the morning at ten o'clock."

Mr. Fredell also testified that, before calling Beale Air Force Base, he had called the Marysville Police Department. He had felt that "whatever Air Force personnel or individual might be responsible should get in trouble for it." Mr. Fredell thought that "this was a law enforcement matter."

Under these circumstances, it is clear that, when Sergeant Johnston went to the apartment to meet with Mr. Fredell—even though he was not in uniform and it was his day off duty—he was acting in a governmental capacity; and, indeed, he was involved in a law-enforcement activity. It is understandable why Sergeant Johnston was reluctant to go to the apartment and meet Mr. Fredell. Under the Posse Comitatus Act, 18 USC § 1385 (1878), military personnel are prohibited from enforcing civil laws. However, basically, this is what Mr. Fredell wanted done: He wanted Sergeant Johnston to act as his debt collector to bring to bear against Jacobs the threat of disciplinary action by the Air Force if the airman did not satisfy his landlord's demands.

Moreover, in connection with Senate hearings conducted in the early 1960s,[2] complaints were received that creditors had attempted to use military commanders as an instrumentality for collecting disputed debts. The commanders would be urged by creditors to advise servicemembers that dishonorable failure to pay a debt was severely punishable and constituted service-discrediting conduct under Article 134 of the Uniform Code of Military Justice, 10 USC § 934. While it is important for the Armed Services to maintain high standards of conduct, the civil courts are available for disputes between landlords and tenants concerning lease violations. Only after those civil remedies have been invoked should military personnel—whether commanders, security police, or others—become involved in the dispute.

Accordingly, I conclude that Sergeant Johnston should never have been in appellant's apartment in the first place and that his entry on the premises in the company of the landlord constituted an unreasonable search in violation of the Fourth Amendment.

### B

The Government finds some comfort in the fact that Sergeant Johnston entered the premises in the company of the landlord. However, a landlord's consent to a search cannot bind the tenant, even if the

---

**2.** The hearings were conducted by the Senate Subcommittee on Constitutional Rights of the Committee on the Judiciary.

terms of the lease and local property law will allow the landlord to enter for emergency purposes.[3] *See Chapman v. United States,* 365 U.S. 610, 612, 617, 81 S.Ct. 776, 777, 780, 5 L.Ed.2d 828 (1961). Moreover, even though a landlord may be entitled to authorize his employees to enter rented premises for such purposes as cleaning, this right does not include authorizing law-enforcement officials to search the tenant's room in the landlord's company. *See Stoner v. California,* 376 U.S. 483, 489–90, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964).

Furthermore, under California law, even Mr. Fredell was not entitled to enter the apartment on the morning that Sergeant Johnston accompanied him. He was not entering because of an "emergency" or to make repairs or to "exhibit the" apartment "to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors." *See* Cal. Civil Code § 1954 (West 1985). Jacobs had not abandoned or surrendered the premises, and there was no court order for such an entry. The landlord entered for the specific purpose of showing Sergeant Johnston the condition of the premises; and this, in turn, was in order to obtain restitution from Jacobs, under pressure from his military superiors, in an amount deemed suitable by the landlord.

Thus, as far as I can determine, Mr. Fredell was a trespasser under California law, and Sergeant Johnston was trespassing right along with him. Johnston's trespass—which occurred when he was acting in a governmental capacity and for purposes of law enforcement—violated the Fourth Amendment and required applica-

tion of the exclusionary rule to all evidence derived therefrom.[4]

## II

Since I have concluded that any evidence obtained as the result of the unlawful entry by Fredell and Johnston should have been suppressed, it is not necessary for me to deal with the granted issue, which concerns applicability of *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), to Sergeant Johnston's actions inside the apartment. However, since the majority addresses this issue, I shall do so, as well.

The military judge and the Court of Military Review found from the evidence of record that the serial numbers of the equipment in appellant's apartment were in Staff Sergeant Johnston's "plain view"— that is, that Johnston did not move the equipment to view the numbers; so there was no search at all when he merely observed the numbers on the equipment. Pointing to this fact, the majority concludes: "Finally, we note that *Arizona v. Hicks, supra,* expressly holds that the observation and recording of serial numbers on items which were not moved is not a search for Fourth Amendment purposes, so they do not require probable cause." 31 MJ at 145.

I am not so sure.

In *Hicks,* a police officer entered the defendant's apartment to investigate a shooting that had occurred there shortly before, injuring a man in the apartment below. In the apartment, the officer saw a number "of expensive stereo components"

---

3. Apparently, a plumbing problem had been alleviated the day before, and any "emergency" was over. Moreover, if the entry is to be ruled lawful because of an "emergency," the military judge—rather than an appellate court—should make the determination that an "emergency" exists.

4. Properly, no one has relied upon Fredell's "apparent authority" to enter appellant's apartment in cases other than an emergency in order to sustain Sergeant Johnston's entry with Fredell. The law from the Supreme Court is clearly established as to expectations of privacy of

tenants of leased premises and the authority— apparent and actual—of management officials to enter. *See United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). Nothing in *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), discussing this circumstance in comparison to the apparent authority of a *cotenant* (or one who appears to be a cotenant) changes in any way the clearly defined legal principles involved in a lessee-lessor relationship like that in this case.

that "seemed out of place in the squalid and otherwise ill-appointed four-room apartment." *Id.* 480 U.S. at 323, 107 S.Ct. at 1152. After "moving some of the components" in order to reveal their serial numbers, the officer recorded those numbers, reported them, and learned that the items had been stolen.

The majority of the Court held that, while nothing the police officer did constituted a seizure of the components, his moving the components so that he could see and record the serial numbers constituted a Fourth Amendment search without probable cause. In the words of the majority:

> Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest. *See Illinois v. Andreas,* 463 U.S. 765, 771 [103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003] (1983). *But taking action, unrelated to the objectives of the authorized intrusion,* which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstances that validated the entry.

480 U.S. at 325, 107 S.Ct. at 1152 (emphasis added).

The majority expressly found it critically important that the officer had moved the objects " 'even a few inches,' " rather than simply " 'looking' at" them. *Id.* Accordingly, the majority in this case has reasonable support for its reading of *Hicks. See also Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

What gives me pause is what might be the practical absurdity of this restrictive reading of *Hicks.* With little difficulty—and with much amusement—one can imagine a well-trained police officer stumbling onto stereo components, as in *Hicks,* or office equipment, as in this case, and contorting and distorting his body in all sorts of ways in an effort to read serial numbers without touching the objects themselves; and all such acrobatics would have nothing

to do at all with the original, valid purpose for his entry.

I am not persuaded that the doctrine of "plain view"—and certainly the logic behind it—includes such circumstances within its ambit. "Plain view" acknowledges that it is illogical and unnecessary to the purpose of the Fourth Amendment for a police officer who is where he otherwise lawfully belongs to ignore something that is in his plain view. In such a circumstance, merely observing what is right in front of the officer, who otherwise properly belongs where he is, is not a further, independent invasion of privacy. *See Horton v. California, supra.*

The doctrine does not, however, acknowledge that it is either logical or consistent with the purpose of the Fourth Amendment to permit such a police officer to seize the accident of his location and aggressively and creatively to pursue a detailed examination of these "plain view" items through all sorts of ludicrous machinations, though all the while not disturbing the item in plain view. While the items themselves might be in plain view, anything (like serial numbers) that can be "viewed" only through such persistent and focused investigation is not.

Thus, while it was important in *Hicks* that the officer moved the components—and while it, thus, is important here that Sergeant Johnston apparently did not—this does not mean that the intrusion into a person's privacy that results from pointed examination of such "plain view" items is unprotected. Instead, I would place significance on the underlined portion of the passage from *Hicks* quoted above: *"taking action, unrelated to the objectives of the authorized intrusion ..."* Accord *Horton v. California, supra.*

This should not be confused with the notion of "inadvertent discovery" that Justice Stewart, writing for the plurality in *Coolidge v. New Hampshire,* 403 U.S. 443, 469–73, 91 S.Ct. 2022, 2040–42, 29 L.Ed.2d 564 (1971), thought was knotted with "plain view" but which the Court, since then, clearly has rejected. *Horton v. Califor-*

*nia, supra.* Instead, it is much like the caution sounded by the majority in *Horton* that the officer must not deviate from what is the scope and the object of his original, legitimate intrusion. 110 S.Ct. at 2309. In short, if the officer legitimately belongs in an auditorium looking for an elephant, he cannot extend his search into a file drawer in that auditorium and look for a ring.

In this case, it is not clear from the record what Sergeant Johnston did in order to see and record the serial numbers of the equipment he saw when he entered the apartment. Therefore, I do not know whether he did or did not comply with *Hicks.* In my view, if Sergeant Johnston lay flat on his back and slid on the floor under a glass table to see the serial number on the bottom of an item on that table, this action would have been unrelated to the scope and the object of his original entry into the apartment and would be unlawful. *See Horton v. California* and *Arizona v. Hicks,* both *supra.* However, in light of my views in earlier sections of this opinion, it is not necessary for me to resolve this question in this case.