Judge STUCKY
delivered the opinion of the court:[1]
We granted review to determine whether the military judge erred in refusing to suppress military property seized by Appellant’s first sergeant after a warrantless entry into Appellant’s off-base apartment. We hold that the military judge did not abuse his discretion. Under the facts and circumstances of this case, Appellant’s Fourth Amendment rights were not violated because the entry into his apartment was not unreasonable.
I. Posture of the Case
Contrary to his pleas, Appellant was convicted by officer members in a general court-martial of one specification of larceny of military property of a value greater than $500 in violation of Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921 (2006). He was sentenced to a bad-conduct discharge, confinement for forty-five days, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals (CCA) affirmed the findings and sentence. United States v. Irizarry, No. ACM 37748, 2012 CCA LEXIS 89, at *8, 2012 WL 1059021, at *3 (A.F.Ct.Crim. App. Mar. 15,2012).
II. Background
Believing that Appellant had failed to timely pay his rent for January 2010, the management of Cedar Creek Apartments posted a notice for him to vacate his apartment by January 11, 2010. Appellant did not vacate his apartment or make any attempt to reconcile the alleged delinquency with the management. He also failed to pay his rent for February 2010. Management posted a second notice to vacate the apartment by February 7. On February 5, the new manager, Ms. Lora Norwood, wanting to ensure there were no misunderstandings, spoke "with Appellant about the rent. Appellant produced money order stubs, as evidence that he had paid his January rent, and said he would pay February’s rent by February 15. Ms. Nor-wood took the stubs and checked management’s records to make sure that his rent had not been misposted. Unable to find evidence that management had received the money orders, Ms. Norwood returned the stubs and asked Appellant to trace the money orders and told him how to do it.
The following week Ms. Norwood tried to contact Appellant to see if he had been able to resolve the money order issue. Unable to contact Appellant, she had a staff member, Mr. Charles Marquette, perform a “skip check” to see if Appellant had abandoned the premises. Upon entering the apartment, Mr. Marquette discovered large amounts of trash, animal food, and feces scattered about the floors, and conditions so unsanitary that a number of repairs, including replacing the floors, would be necessary to make the apartment livable for the next tenant.
*102 Based on Mr. Marquette’s experiences in the Navy, he and Ms. Norwood decided to seek assistance from Appellant’s military supervisors to convince Appellant to pay for the rent and repairs without the necessity of civil legal action. After unsuccessfully trying to e-mail photos of the damages to Appellant’s first sergeant, Master Sergeant (MSgt) Matthew G. Saganski, Ms. Norwood invited him to visit the apartment. After two invitations, MSgt Saganski agreed.
On February 23, MSgt Saganski and Technical Sergeant (TSgt) Charles Zenor, Appellant’s immediate supervisor, went to the apartment to view the damage. Before he went to view the apartment, MSgt Saganski discussed his trip with his commander, and told the commander he would report back. MSgt Saganski and TSgt Zenor testified that their purpose in visiting the property was to determine the state of the apartment to decide if Appellant should be counseled about the issue, show the community the Air Force cared about the situation, and protect Appellant from overreaching by the landlord if necessary. MSgt Saganski testified:
I went there because [Cedar Creek] had called me numerous times. I went there to find out more of the facts about what was going on so that I could come back and discuss with Airman Irizarry and the commander, the situation and hopefully put a better light on the Air Force that yes, somebody from the Air Force does care, and that we came to see what they had to show.
My intent was to find out how bad things really were, how much money'did he really owe, so that when I sat down with [Appellant] later ... he could be counseled and he could be talked to, and see if we can get the situation remedied.
TSgt Zenor echoed MSgt Saganski’s desire to show the community that the Air Force eared and testified that they took a camera with them to “document any damage and [the] condition of the apartment” and “to protect [Appellant]” if the damage to the apartment was not as extensive as the landlord purported. They visited the apartment in their uniforms, during duty hours, in their official capacity, but not in a law enforcement capacity.
Mr. Marquette took MSgt Saganski and TSgt Zenor to view the apartment. Before entering the apartment, Ms. Norwood discussed with them her intent to post an “Abandonment” sign on the apartment door.[2] MSgt Saganski and TSgt Zenor saw that Ms. Norwood had accurately described the damage. There was a large amount of trash and animal feces on the floor, the bathroom door was off its hinges, and bags of cat and dog food had been cut open and left on the floor (presumably so the animals could eat while Appellant was out of town on leave). MSgt Saganski and TSgt Zenor walked through the apartment taking pictures to document the damage.
During the walk through, MSgt Saganski and TSgt Zenor noticed part of a B-l aircraft (an altitude vertical velocity indicator (AWI)), partially covered by an article of clothing on Appellant’s bedroom floor. MSgt Saganski testified he recognized the part and knew there was no reason Appellant should have an AWI in his possession. TSgt Zenor testified that he immediately recognized the part, and suspected it to be the same part that was missing from the B-l repair shop at the base. MSgt Saganski testified that he seized the equipment to ensure its safekeeping as he worried that an “Abandonment” sign or eviction notice would attract thieves.
At trial, Appellant filed a motion to suppress the evidence resulting from the search of Appellant’s apartment. After an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), session to litigate the motion, the military judge denied the motion. The CCA held that the military judge did not abuse his discretion in denying the motion to suppress. Irizarry, 2012 CCA LEXIS 89, at *5, 2012 WL 1059021, at *2. The lower court relied heavily on United States v. Jacobs, 31 M.J. 138 *103 (C.M.A.1990), to hold that the entry by the landlord complied with the lease, and MSgt Saganski and TSgt Zenor lawfully entered the apartment “in the shoes” of the landlord for the purpose of encouraging Appellant to make the necessary repairs. Id,., 2012 WL 1059021, at *2 (internal quotation marks omitted).
III. Standard of Review
This Court reviews a military judge’s ruling on a motion to suppress for abuse of discretion. United States v. Clayton, 68 M.J. 419, 423 (C.A.A.F.2010); United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F.1995).
A military judge abuses his discretion when his findings of fact are clearly erroneous, the court’s decision is influenced by an erroneous view of the law, or the military judge’s decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law.
United States v. Miller, 66 M.J. 306, 307 (C.A.A.F.2008); accord United States v. Graner, 69 M.J. 104, 107 (C.A.A.F.2010).
IV. Law and Analysis
The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV. A Fourth Amendment “search” only occurs when “the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).
Appellant had a reasonable expectation of privacy in his apartment and, therefore, a “search” under the Fourth Amendment occurred. However, the Fourth Amendment does not prohibit all warrantless searches, only those that are “unreasonable.” See Cady v. Dombrowski 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); United States v. Michael, 66 M.J. 78, 80 (C.A.A.F.2008).
Whether a search is unreasonable is evaluated on a case-by-case basis, depending on the facts and circumstances of each situation. United States v. Chadwick, 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (citing Cooper v. California, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967)). With few exceptions, the warrantless search of a home is unreasonable. Kyllo, 533 U.S. at 31, 121 S.Ct. 2038. One such exception, argued by the Government as dispositive in this case, is third-party common authority consent — consent by a person who is entitled to joint access or control of the property for most purposes. United States v. Matlock, 415 U.S. 164, 170, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Under the circumstances of this case, the landlord did not have common authority under Supreme Court jurisprudence to grant consent to the NCOs to enter Appellant’s apartment for a law enforcement purpose.[3] See Georgia v. Randolph, 547 U.S. 103, 112, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. 988. But that does not end our inquiry. We must still inquire whether, recognizing that the home is “ ‘[a]t the very core’ ” of the Fourth Amendment, Kyllo, 533 U.S. at 31, 121 S.Ct. 2038, it was reasonable under the circumstances for Cedar Creek to let the NCOs into Appellant’s home.
A. Entry Under the Lease Provisions and Jacobs
Appellant was in default under the terms of the lease, but even if Appellant was *104 not in default, Cedar Creek and its “representatives” could enter for a number of reasons.[4] After Appellant failed to pay his rent, it was reasonable for Mr. Marquette to enter the premises to determine whether Appellant had abandoned the apartment, post notices inside the apartment, and estimate repair or refurbishing costs after he discovered the state of the apartment. Furthermore, once the damages were discovered, it was reasonable for Cedar Creek to take action to minimize the damages and seek prompt restitution by the quickest and least intrusive manner — including contacting Appellant’s military supervisors. At the time, Ms. Nor-wood was not seeking criminal or even civil sanctions against Appellant.
The NCOs acted reasonably in entering Appellant’s apartment at the behest of Cedar Creek as its “representative” under the lease. See Jacobs, 31 M.J. 138. Cedar Creek invited the NCOs to assist them in securing rent and repairs from Appellant— something that necessarily includes viewing the damage to estimate repair costs, as allowed under paragraph 28 of the lease, and to determine how to counsel Appellant.
Jacobs supports this reading of the lease. In Jacobs, while the accused was on leave, the landlord entered the accused’s apartment to effect emergency plumbing repairs and found the apartment “trashed.” Id. at 139. Concerned about the state of the apartment and to ensure repairs, the landlord contacted Staff Sergeant (SSG) Johnston — the accused’s flight chief. Id. SSG Johnston initially declined to help, but eventually agreed to look and counsel the accused if necessary. Id. When SSG Johnston entered the accused’s apartment the next day, he found stolen military property in the accused’s apartment in plain view. Id. at 140. The Court held the accused’s Fourth Amendment rights were not violated because under the lease and state law the landlord could lawfully enter a tenant’s apartment, along with his “agent or representative,” to make emergency repairs. Id. at 143.[5]
This case is stronger than Jacobs because, although both leases allowed landlords to grant their representatives entry, the lease in Jacobs limited entry to “necessary” or “emergency” repairs. Id. at 144 n. 4. Similarly, California law limited a landlord to entry for emergency, necessary, or agreed repairs. Id. The lease here allowed the landlord entry for a broader range of purposes, including making and estimating repairs. Furthermore, under Texas law an accused can knowingly and voluntarily contract to allow third parties to enter a space where the accused has a reasonable expectation of privacy. See United States v. Griffin, 555 F.2d 1323, 1324-25 (5th Cir.1977); Salpas v. State, 642 S.W.2d 71, 72-73 (Tex.Ct.App.1982); Ferris v. State, 640 S.W.2d 636, 638 (Tex.Ct.App.1982).[6] Other circuits have *105 ruled similarly. See United States v. Smith, 353 Fed.Appx. 229, 230 (11th Cir.2009) (holding that a storage facility manager had actual authority over a storage unit, and to admit agents, including police, to make repairs and ensure the safety of the unit, where the renter breached the terms of the agreement and the storage owner discovered contraband when he went to make repairs).
The concurring judges unnecessarily desire to overturn the fact-specific holding in Jacobs. They take particular issue with the statement that a landlord is not required to have common authority to allow “police to enter the apartment ‘in the shoes’ of the landlord to assist him in making emergency repairs.” 31 M.J. at 144 (noting that where a landlord has actual authority to enter for a certain purpose the police may stand “ ‘in the shoes’” of the landlord for that purpose (quoting Sledge, 650 F.2d at 1080 n. 10)). But they fail to note that the Jacobs court used this language in the context of distinguishing the situation in Jacobs from Chapman v. United States, 365 U.S. 610, 616-17, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), which forbids police entry for law enforcement purposes. 31 M.J. at 144. Furthermore, neither Sledge nor the operative cases cited in the footnote have been negated or overturned. In short, Sledge was persuasive authority that the Jacobs court applied, and the concurring opinion has not shown that the “‘in the shoes’” language is an incorrect statement of law.
Finally, although the Supreme Court has held that a landlord may not consent to entry by law enforcement to search for evidence of a crime in some circumstances, there is no Supreme Court precedent indicating that a landlord may never consent to entry for non-law enforcement purposes where state law and the lease allow. Chapman is factually distinguishable from this case. In Chapman, the police and landlord forced open a window to gain entry for the purpose of searching for criminal activity. 365 U.S. at 616, 81 S.Ct. 776. The Supreme Court held that state police officers did not have the right to enter a tenant’s premises, even with the landlord’s consent, to search for evidence of a crime. Id. at 616-18, 81 S.Ct. 776. There is no police presence, no forced entry, and no law enforcement motivation here.[7] The Supreme Court did not claim that lease terms and state law could never provide a right to enter; rather, it declined to read a right of entry from the common law and noted that the parties provided no state case or statute providing such a right.[8] Id.
Randolph is also factually distinguishable. In Randolph, a present co-occupant was objecting to police entry of his home — a situation clearly not present here. 547 U.S. at 113-14, 126 S.Ct. 1515. The holding in Randolph does not reach entry for non-law enforcement purposes, or entry without the presence of a co-tenant.[9] Id. The Supreme Court suggested in dicta that landlords have no customary understanding of authority to admit persons without the consent of the occupant, and that ordinary rental agreements do not provide such authority. Id. at 112, 126 S.Ct. 1515. However, even assuming dictum from a factually distinguishable case is dispositive, these circumstances are not “common” or “ordinary” and it is necessary to look to reasonableness under this contractual arrangement and the circumstances surrounding this intrusion. In sum, none of the Supreme Court cases cited by the concurrence hold that a landlord may never consent to entry for non-law enforcement purposes.
*106 B. Reasonableness of Entry as Command Representatives
MSgt Saganski’s and TSgt Zenor’s status as “government agents” acting in their “official capacity” triggered Appellant’s Fourth Amendment rights. However, this status was based solely on the fact that MSgt Sa-ganski and TSgt Zenor are command representatives performing quintessential command functions — looking out for one of their airmen and maintaining good relations with the local community. See, e.g., Dep’t of the Air Force, Instr. 36-2618, The Enlisted Force Structure ¶ 4.1.9 (Feb. 27, 2009) (providing a mandatory duty for all NCOs to “be familiar with subordinates’ off-duty opportunities and living conditions”); id. at 5.1.13 (stating the mandatory duties of senior NCOs to “[pjromote responsible behaviors within all Airmen” and “[r]eadily detect and correct unsafe and/or irresponsible behaviors that negatively impact unit or individual readiness”).
Although the NCOs were members of the United States Air Force with supervisory responsibilities over Appellant, they were not acting for a law enforcement or even a regulatory purpose. They were not seeking evidence of a crime or a violation of some regulation. Cf. Chapman, 365 U.S. at 616-18, 81 S.Ct. 776 (striking down a warrantless entry by police to search for evidence of a crime); Camara v. Municipal Court, 387 U.S. 523, 535-39, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (striking down some warrantless administrative searches). Rather, they were acting as military leaders with at least two purposes related to their command function: (1) to minimize possible adverse consequences — loss of his living quarters and overcharging for damages to his apartment — to a subordinate; and (2) maintaining a good relationship between the Air Force and the civilian community by assisting a landlord who did not want to pursue civil legal remedies against a military member. Rigid application of Fourth Amendment case law from other jurisdictions to the conduct at issue would fail to account for MSgt Saganski’s and TSgt Zenor’s unique “official” duty, as senior NCOs, to be apprised of their subordinates’ behavior and to look out for the well-being of their men and women.
In this context, MSgt Saganski and TSgt Zenor acted reasonably.[10] Moreover, where, as here, command representatives entered a subordinate’s off-base residence (1) in order to effectuate their command responsibilities, and (2) with no law enforcement purpose and no expectation that a crime had been committed, or that evidence would be found, it would be unreasonable to expect command representatives to seek a warrant prior to entering. Indeed, under the facts of this case, it is unclear on what basis a warrant could have been obtained as the standard for obtaining a warrant is wholly unrelated to the impetus behind the *107 NCOs’ entry. See Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (concluding that a magistrate’s probable cause determination must be supported by “a fair probability that contraband or evidence of a crime will be found in a particular place”). This is not to say that the degree of difficulty in obtaining a warrant justifies a warrantless entry in every ease. However, where, as here, attempting to obtain a warrant is impracticable, and does not further the purposes of the Fourth Amendment it is unnecessary to try to get a warrant and the absence of one does not render a search unreasonable. See, e.g., Nat’l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (“neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance”); New Jersey v. T.L.O., 469 U.S. 325, 340-42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (recognizing that the warrant requirement is unsuited to certain environments).
We do not intend to create a broad military exception to the Fourth Amendment; rather, where: (1) command representatives are performing a command function; (2) a reasonable reading of the lease terms permits the landlord to enter; (3) military officials entered the premises at the behest of the landlord; and (4) the purpose of the entry is not for law enforcement purposes or a mere pretext for conducting a warrantless search, Jacobs’s exception to the warrant requirement because the “search” is reasonable makes eminent sense. Under the circumstances of this case, the NCOs intrusion into Appellant’s apartment was not a violation of the Fourth Amendment. Therefore, the military judge did not abuse his discretion in refusing to suppress the AWL
V. Conclusion
The judgment of the United States Air Force Court of Criminal Appeals is affirmed.

. We heard oral argument in this case at The University of Oklahoma College of Law as part of the Court’s "Project Outreach.” See United States v. Mahoney, 58 M.J. 346, 347 n. 1 (C.A.A.F.2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

. At this point the apartment was not "Abandoned” according to Ms. Norwood, or as a matter of Texas law. However, Ms. Norwood posted an abandonment notice on the apartment door shortly after the noncommissioned officers (NCOs) entered the apartment.

. Another relevant exception is surrender or abandonment. See Michael, 66 M.J. at 80 n. 4. Cedar Creek personnel did not believe Appellant had surrendered or abandoned his apartment, and we need not decide the issue. But see United States v. Sledge, 650 F.2d 1075, 1082 n. 13 (9th Cir.1981) (suggesting that some circuits have accepted federal officers searching premises that were only "apparently abandoned” rather than abandoned as a matter of law).

. The lease allowed Cedar Creek and its "repairers, servicers, contractors, and representatives” to enter if:
(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; and
(2) entry is for: ... making repairs or replacements; estimating repair or refurbishing costs ... preventing waste of utilities; exercising our contractual lien; leaving notices ... removing health or safety hazards (including hazardous materials) ... removing perishable foodstuffs if your electricity is disconnected .... inspecting when immediate danger to person or property is reasonably suspected ....

. The landlord in Jacobs initially entered, pursuant to the lease, to make emergency repairs. Jacobs, 31 M.J. at 139. However, after the landlord completed the emergency plumbing repairs, he sought further help from the accused’s military supervisors to further repair the trashed apartment. Id. Therefore, although the lease and relevant state law permitted entry for emergency repairs in addition to "necessary or agreed repairs,” it does not appear that the presence of a then-existing emergency situation was disposi-tive of the Court’s decision. Id. at 144 nn. 4 & 5.

.The concurring opinion reads the lease narrowly to suggest that the NCOs had to enter the apartment, tools in hand, ready to perform repairs, or have a ledger ready to precisely estimate costs. We do not read the lease so narrowly, nor does the plain language of the lease or Texas law require such a narrow reading. Although the concurring opinion relies on such cases, it is unclear how much bearing Texas law has on the outcome of this case. This is not a civil case dealing with an oil and gas lease or a landlord-tenant dispute that can be resolved through equitable rules. See Cammack the Cook, L.L.C. v. Eastburn, 296 S.W.3d 884 (Tex.Ct.App.2009); ABS Sherman Properties, Ltd. v. Sarris, *105 626 S.W.2d 538 (Tex.Ct.App.1981); Buffalo Pipeline Co. v. Bell, 694 S.W.2d 592 (Tex.Ct.App.1985). It is a criminal case addressing Fourth Amendment issues and the overarching inquiry is reasonableness rather than restitution.

. United States v. Warner, 843 F.2d 401 (9th Cir.1988), is similarly distinguishable.

. The Supreme Court has backed away from the holding in Chapman, stating that it is "ambiguous in its implications." Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

. Matlock, like Randolph, addressed common authority in the context of co-occupied premises. 415 U.S. at 171-72, 94 S.Ct. 988. We agree that common authority is inapplicable to this case. However, neither Matlock, nor Randolph hold that common authority is the only way to uphold a warrantless entry.

. Furthermore, United States v. Wilson, 472 F.2d 901, 902-03 (9th Cir.1972), illustrates that an accused’s conduct can diminish or extinguish a reasonable expectation of privacy such that consent by a landlord to a warrantless search can be reasonable under some circumstances. After Wilson failed to pay his rent for two weeks, his landlord was informed that Wilson was gone and his return uncertain. Id. at 902. The landlord entered the apartment believing it was abandoned and found it in a similar state to Appellant's apartment — in disarray, with clothing, electronics, and contraband lying around. Id. In upholding the landlord’s entry, the United States Court of Appeals for the Ninth Circuit did not depend on the landlord’s opinion as to whether the apartment was abandoned, require an express finding of abandonment, or even find the apartment abandoned. Id. at 903 ("When Wilson departed his lodgings, leaving ... the rent unpaid, he should not have been surprised at his landlord's visit. The landlord saw explosives in plain view and considerable evidence of abandonment.”). Rather, it adopted a functional view of the Fourth Amendment and held that the "local law of real property does not provide the exclusive basis upon which to decide Fourth Amendment questions.” Id. at 902. We do not decide whether Appellant's apartment was abandoned under Texas law, but recognize that, like in Wilson, by failing to pay the rent, damaging the apartment, and failing to respond to his landlord’s inquiries, Appellant significantly diminished his expectation of privacy in the apartment. See also Skinner v. Ry. Labor Execs.' Ass’n, 489 U.S. 602, 627-28, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding that expectations of privacy can be reasonable, but diminished, based upon conduct or status, and that a diminished expectation of privacy can be used in evaluating reasonableness).