UNITED STATES, Appellee

v.

Pablo P. IRIZARRY Jr., Airman First Class
U.S. Air Force, Appellant

No. 12-0451

Crim. App. No. 37748

United States Court of Appeals for the Armed Forces

Argued November 7, 2012

Decided April 15, 2013

STUCKY, J., delivered the opinion of the Court, in which RYAN, J., and COX, S.J., joined. ERDMANN, J., filed a separate opinion dissenting in part and concurring in the result, in which BAKER, C.J., joined.

Counsel

For Appellant: Dwight H. Sullivan, Esq. (argued); Captain Travis K. Ausland (on brief); Captain Shane McCammon.

For Appellee: Major Lauren N. DiDomenico (argued); Colonel Don M. Christensen and Gerald R. Bruce, Esq. (on brief).

Amicus Curiae for Appellee: Gauri D. Nautiyal (law student) (argued); Robert D. Gifford II, Esq. (supervising attorney) (on brief) - The University of Oklahoma College of Law.

Military Judge: William C. Muldoon Jr.

**This opinion is subject to revision before final publication.**

Judge STUCKY delivered the opinion of the court:[1]

We granted review to determine whether the military judge erred in refusing to suppress military property seized by Appellant's first sergeant after a warrantless entry into Appellant's off-base apartment. We hold that the military judge did not abuse his discretion. Under the facts and circumstances of this case, Appellant's Fourth Amendment rights were not violated because the entry into his apartment was not unreasonable.

## I. Posture of the Case

Contrary to his pleas, Appellant was convicted by officer members in a general court-martial of one specification of larceny of military property of a value greater than $500 in violation of Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921 (2006). He was sentenced to a bad-conduct discharge, confinement for forty-five days, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals (CCA) affirmed the findings and sentence.

---

[1] We heard oral argument in this case at The University of Oklahoma College of Law as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

United States v. Irizarry, No. ACM 37748, 2012 CCA LEXIS 89, at *8, 2012 WL 1059021, at *3 (A. F. Ct. Crim. App. Mar. 15, 2012).

## II.   Background

Believing that Appellant had failed to timely pay his rent for January 2010, the management of Cedar Creek Apartments posted a notice for him to vacate his apartment by January 11, 2010.  Appellant did not vacate his apartment or make any attempt to reconcile the alleged delinquency with the management.  He also failed to pay his rent for February 2010. Management posted a second notice to vacate the apartment by February 7.  On February 5, the new manager, Ms. Lora Norwood, wanting to ensure there were no misunderstandings, spoke with Appellant about the rent.  Appellant produced money order stubs, as evidence that he had paid his January rent, and said he would pay February's rent by February 15.  Ms. Norwood took the stubs and checked management's records to make sure that his rent had not been misposted.  Unable to find evidence that management had received the money orders, Ms. Norwood returned the stubs and asked Appellant to trace the money orders and told him how to do it.

The following week Ms. Norwood tried to contact Appellant to see if he had been able to resolve the money order issue. Unable to contact Appellant, she had a staff member, Mr. Charles Marquette, perform a "skip check" to see if Appellant had

abandoned the premises.  Upon entering the apartment, Mr. Marquette discovered large amounts of trash, animal food, and feces scattered about the floors, and conditions so unsanitary that a number of repairs, including replacing the floors, would be necessary to make the apartment livable for the next tenant.

Based on Mr. Marquette's experiences in the Navy, he and Ms. Norwood decided to seek assistance from Appellant's military supervisors to convince Appellant to pay for the rent and repairs without the necessity of civil legal action.  After unsuccessfully trying to e-mail photos of the damages to Appellant's first sergeant, Master Sergeant (MSgt) Matthew G. Saganski, Ms. Norwood invited him to visit the apartment.  After two invitations, MSgt Saganski agreed.

On February 23, MSgt Saganski and Technical Sergeant (TSgt) Charles Zenor, Appellant's immediate supervisor, went to the apartment to view the damage.  Before he went to view the apartment, MSgt Saganski discussed his trip with his commander, and told the commander he would report back.  MSgt Saganski and TSgt Zenor testified that their purpose in visiting the property was to determine the state of the apartment to decide if Appellant should be counseled about the issue, show the community the Air Force cared about the situation, and protect Appellant from overreaching by the landlord if necessary.  MSgt Saganski testified:

4

> I went there because [Cedar Creek] had called me numerous times. I went there to find out more of the facts about what was going on so that I could come back and discuss with Airman Irizarry and the commander, the situation and hopefully put a better light on the Air Force that yes, somebody from the Air Force does care, and that we came to see what they had to show.
>
> . . . .
>
> My intent was to find out how bad things really were, how much money did he really owe, so that when I sat down with [Appellant] later . . . he could be counseled and he could be talked to, and see if we can get the situation remedied.

TSgt Zenor echoed MSgt Saganski's desire to show the community that the Air Force cared and testified that they took a camera with them to "document any damage and [the] condition of the apartment" and "to protect [Appellant]" if the damage to the apartment was not as extensive as the landlord purported. They visited the apartment in their uniforms, during duty hours, in their official capacity, but not in a law enforcement capacity.

Mr. Marquette took MSgt Saganski and TSgt Zenor to view the apartment. Before entering the apartment, Ms. Norwood discussed with them her intent to post an "Abandonment" sign on the apartment door.[2] MSgt Saganski and TSgt Zenor saw that Ms. Norwood had accurately described the damage. There was a large amount of trash and animal feces on the floor, the bathroom door

---

[2] At this point the apartment was not "Abandoned" according to Ms. Norwood, or as a matter of Texas law. However, Ms. Norwood posted an abandonment notice on the apartment door shortly after the noncommissioned officers (NCOs) entered the apartment.

was off its hinges, and bags of cat and dog food had been cut open and left on the floor (presumably so the animals could eat while Appellant was out of town on leave). MSgt Saganski and TSgt Zenor walked through the apartment taking pictures to document the damage.

During the walk through, MSgt Saganski and TSgt Zenor noticed part of a B-1 aircraft (an altitude vertical velocity indicator (AVVI)), partially covered by an article of clothing on Appellant's bedroom floor. MSgt Saganski testified he recognized the part and knew there was no reason Appellant should have an AVVI in his possession. TSgt Zenor testified that he immediately recognized the part, and suspected it to be the same part that was missing from the B-1 repair shop at the base. MSgt Saganski testified that he seized the equipment to ensure its safekeeping as he worried that an "Abandonment" sign or eviction notice would attract thieves.

At trial, Appellant filed a motion to suppress the evidence resulting from the search of Appellant's apartment. After an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), session to litigate the motion, the military judge denied the motion. The CCA held that the military judge did not abuse his discretion in denying the motion to suppress. Irizarry, 2012 CCA LEXIS 89, at *5, 2012 WL 1059021, at *2. The lower court relied heavily on United States v. Jacobs, 31 M.J. 138 (C.M.A. 1990), to hold that

the entry by the landlord complied with the lease, and MSgt

Saganski and TSgt Zenor lawfully entered the apartment "in the

shoes" of the landlord for the purpose of encouraging Appellant

to make the necessary repairs. Id., 2012 WL 1059021, at *2

(internal quotation marks omitted).

## III. Standard of Review

This Court reviews a military judge's ruling on a motion to

suppress for abuse of discretion. United States v. Clayton, 68

M.J. 419, 423 (C.A.A.F. 2010); United States v. Ayala, 43 M.J.

296, 298 (C.A.A.F. 1995).

> A military judge abuses his discretion when his
> findings of fact are clearly erroneous, the court's
> decision is influenced by an erroneous view of the
> law, or the military judge's decision on the issue at
> hand is outside the range of choices reasonably
> arising from the applicable facts and the law.

United States v. Miller, 66 M.J. 306, 307 (C.A.A.F. 2008);

accord United States v. Graner, 69 M.J. 104, 107 (C.A.A.F.

2010).

## IV. Law and Analysis

The Fourth Amendment provides:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons
> or things to be seized.

7

U.S. Const. amend. IV. A Fourth Amendment "search" only occurs when "the government violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001).

Appellant had a reasonable expectation of privacy in his apartment and, therefore, a "search" under the Fourth Amendment occurred. However, the Fourth Amendment does not prohibit all warrantless searches, only those that are "unreasonable." See Cady v. Dombrowski, 413 U.S. 433, 439 (1973); United States v. Michael, 66 M.J. 78, 80 (C.A.A.F. 2008).

Whether a search is unreasonable is evaluated on a case-by-case basis, depending on the facts and circumstances of each situation. United States v. Chadwick, 433 U.S. 1, 9 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991) (citing Cooper v. California, 386 U.S. 58, 59 (1967)). With few exceptions, the warrantless search of a home is unreasonable. Kyllo, 533 U.S. at 31. One such exception, argued by the Government as dispositive in this case, is third-party common authority consent -- consent by a person who is entitled to joint access or control of the property for most purposes. United States v. Matlock, 415 U.S. 164, 170, 171 n.7 (1974). Under the circumstances of this case, the landlord did not have common authority under Supreme Court jurisprudence to grant consent to the NCOs to enter Appellant's apartment for a

law enforcement purpose.[3]  See Georgia v. Randolph, 547 U.S. 103,

112 (2006); Matlock, 415 U.S. at 171 n.7.  But that does not end

our inquiry.  We must still inquire whether, recognizing that

the home is "'[a]t the very core'" of the Fourth Amendment,

Kyllo, 533 U.S. at 31, it was reasonable under the circumstances

for Cedar Creek to let the NCOs into Appellant's home.

### A.  Entry Under the Lease Provisions and Jacobs

Appellant was in default under the terms of the lease, but

even if Appellant was not in default, Cedar Creek and its

"representatives" could enter for a number of reasons.[4]  After

Appellant failed to pay his rent, it was reasonable for Mr.

---

[3] Another relevant exception is surrender or abandonment.  See
Michael, 66 M.J. at 80 n.4.  Cedar Creek personnel did not
believe Appellant had surrendered or abandoned his apartment,
and we need not decide the issue.  But see United States v.
Sledge, 650 F.2d 1075, 1082 n.13 (9th Cir. 1981) (suggesting
that some circuits have accepted federal officers searching
premises that were only "apparently abandoned" rather than
abandoned as a matter of law).

[4] The lease allowed Cedar Creek and its "repairers,
servicers, contractors, and representatives" to enter if:

> (1) written notice of the entry is left in a
> conspicuous place in the apartment immediately
> after the entry; and

(2) entry is for: . . . making repairs or replacements;
estimating repair or refurbishing costs . . . preventing waste
of utilities; exercising our contractual lien; leaving
notices . . . removing health or safety hazards (including
hazardous materials) . . . removing perishable foodstuffs if
your electricity is disconnected . . . . inspecting when
immediate danger to person or property is reasonably
suspected . . . .

Marquette to enter the premises to determine whether Appellant had abandoned the apartment, post notices inside the apartment, and estimate repair or refurbishing costs after he discovered the state of the apartment.  Furthermore, once the damages were discovered, it was reasonable for Cedar Creek to take action to minimize the damages and seek prompt restitution by the quickest and least intrusive manner -- including contacting Appellant's military supervisors.  At the time, Ms. Norwood was not seeking criminal or even civil sanctions against Appellant.

The NCOs acted reasonably in entering Appellant's apartment at the behest of Cedar Creek as its "representative" under the lease.  See Jacobs, 31 M.J. 138.  Cedar Creek invited the NCOs to assist them in securing rent and repairs from Appellant -- something that necessarily includes viewing the damage to estimate repair costs, as allowed under paragraph 28 of the lease, and to determine how to counsel Appellant.

Jacobs supports this reading of the lease.  In Jacobs, while the accused was on leave, the landlord entered the accused's apartment to effect emergency plumbing repairs and found the apartment "trashed."  Id. at 139.  Concerned about the state of the apartment and to ensure repairs, the landlord contacted Staff Sergeant (SSG) Johnston -- the accused's flight chief.  Id.  SSG Johnston initially declined to help, but eventually agreed to look and counsel the accused if necessary.

Id.  When SSG Johnston entered the accused's apartment the next day, he found stolen military property in the accused's apartment in plain view.  Id. at 140.  The Court held the accused's Fourth Amendment rights were not violated because under the lease and state law the landlord could lawfully enter a tenant's apartment, along with his "agent or representative," to make emergency repairs.  Id. at 143.[5]

This case is stronger than Jacobs because, although both leases allowed landlords to grant their representatives entry, the lease in Jacobs limited entry to "necessary" or "emergency" repairs.  Id. at 144 n.4.  Similarly, California law limited a landlord to entry for emergency, necessary, or agreed repairs. Id.  The lease here allowed the landlord entry for a broader range of purposes, including making and estimating repairs. Furthermore, under Texas law an accused can knowingly and voluntarily contract to allow third parties to enter a space where the accused has a reasonable expectation of privacy.  See United States v. Griffin, 555 F.2d 1323, 1324–25 (5th Cir.

---

[5] The landlord in Jacobs initially entered, pursuant to the lease, to make emergency repairs.  Jacobs, 31 M.J. at 139. However, after the landlord completed the emergency plumbing repairs, he sought further help from the accused's military supervisors to further repair the trashed apartment.  Id. Therefore, although the lease and relevant state law permitted entry for emergency repairs in addition to "necessary or agreed repairs," it does not appear that the presence of a then-existing emergency situation was dispositive of the Court's decision.  Id. at 144 nn.4 & 5.

1977); Salpas v. State, 642 S.W.2d 71, 72–73 (Tex. Ct. App. 1982); Ferris v. State, 640 S.W.2d 636, 638 (Tex. Ct. App. 1982).[6] Other circuits have ruled similarly. See United States v. Smith, 353 F. App'x 229, 230 (11th Cir. 2009) (holding that a storage facility manager had actual authority over a storage unit, and to admit agents, including police, to make repairs and ensure the safety of the unit, where the renter breached the terms of the agreement and the storage owner discovered contraband when he went to make repairs).

The concurring judges unnecessarily desire to overturn the fact-specific holding in Jacobs. They take particular issue with the statement that a landlord is not required to have common authority to allow "police to enter the apartment 'in the shoes' of the landlord to assist him in making emergency repairs." 31 M.J. at 144 (noting that where a landlord has

---

[6] The concurring opinion reads the lease narrowly to suggest that the NCOs had to enter the apartment, tools in hand, ready to perform repairs, or have a ledger ready to precisely estimate costs. We do not read the lease so narrowly, nor does the plain language of the lease or Texas law require such a narrow reading. Although the concurring opinion relies on such cases, it is unclear how much bearing Texas law has on the outcome of this case. This is not a civil case dealing with an oil and gas lease or a landlord-tenant dispute that can be resolved through equitable rules. See Cammack the Cook, L.L.C. v. Eastburn, 296 S.W. 3d 884 (Tex. Ct. App. 2009); ABS Sherman Properties, Ltd. v. Sarris, 626 S.W. 2d 538 (Tex. Ct. App. 1981); Buffalo Pipeline Co. v. Bell, 694 S.W. 2d 592 (Tex. Ct. App. 1985). It is a criminal case addressing Fourth Amendment issues and the overarching inquiry is reasonableness rather than restitution.

actual authority to enter for a certain purpose the police may stand "'in the shoes'" of the landlord for that purpose (quoting Sledge, 65 F.3d at 1080 n.10). But they fail to note that the Jacobs court used this language in the context of distinguishing the situation in Jacobs from Chapman v. United States, 365 U.S. 610, 616-17 (1961), which forbids police entry for law enforcement purposes. 31 M.J. at 144. Furthermore, neither Sledge nor the operative cases cited in the footnote have been negated or overturned. In short, Sledge was persuasive authority that the Jacobs court applied, and the concurring opinion has not shown that the "'in the shoes'" language is an incorrect statement of law.

Finally, although the Supreme Court has held that a landlord may not consent to entry by law enforcement to search for evidence of a crime in some circumstances, there is no Supreme Court precedent indicating that a landlord may never consent to entry for non-law enforcement purposes where state law and the lease allow. Chapman is factually distinguishable from this case. In Chapman, the police and landlord forced open a window to gain entry for the purpose of searching for criminal activity. 365 U.S. at 616. The Supreme Court held that state police officers did not have the right to enter a tenant's premises, even with the landlord's consent, to search for evidence of a crime. Id. at 616-18. There is no police

13

presence, no forced entry, and no law enforcement motivation here.[7]  The Supreme Court did not claim that lease terms and state law could never provide a right to enter; rather, it declined to read a right of entry from the common law and noted that the parties provided no state case or statute providing such a right.[8]  Id.

Randolph is also factually distinguishable.  In Randolph, a present co-occupant was objecting to police entry of his home -- a situation clearly not present here.  547 U.S. at 113-14.  The holding in Randolph does not reach entry for non-law enforcement purposes, or entry without the presence of a co-tenant.[9]  Id. The Supreme Court suggested in dicta that landlords have no customary understanding of authority to admit persons without the consent of the occupant, and that ordinary rental agreements do not provide such authority.  Id. at 112.  However, even assuming dictum from a factually distinguishable case is dispositive, these circumstances are not "common" or "ordinary"

---

[7] United States v. Warner, 843 F.2d 401 (9th Cir. 1988), is similarly distinguishable.

[8] The Supreme Court has backed away from the holding in Chapman, stating that it is "ambiguous in its implications."  Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).

[9] Matlock, like Randolph, addressed common authority in the context of co-occupied premises.  415 U.S. at 171–72.  We agree that common authority is inapplicable to this case.  However, neither Matlock, nor Randolph hold that common authority is the only way to uphold a warrantless entry.

14

and it is necessary to look to reasonableness under this contractual arrangement and the circumstances surrounding this intrusion. In sum, none of the Supreme Court cases cited by the concurrence hold that a landlord may never consent to entry for non-law enforcement purposes.

   B.  Reasonableness of Entry as Command Representatives

   MSgt Saganski's and TSgt Zenor's status as "government agents" acting in their "official capacity" triggered Appellant's Fourth Amendment rights.  However, this status was based solely on the fact that MSgt Saganski and TSgt Zenor are command representatives performing quintessential command functions -- looking out for one of their airmen and maintaining good relations with the local community.  See, e.g., Dep't of the Air Force, Instr. 36-2618, The Enlisted Force Structure ¶ 4.1.9 (Feb. 27, 2009) (providing a mandatory duty for all NCOs to "be familiar with subordinates' off-duty opportunities and living conditions"); id. at 5.1.13 (stating the mandatory duties of senior NCOs to "[p]romote responsible behaviors within all Airmen" and "[r]eadily detect and correct unsafe and/or irresponsible behaviors that negatively impact unit or individual readiness").

   Although the NCOs were members of the United States Air Force with supervisory responsibilities over Appellant, they were not acting for a law enforcement or even a regulatory

15

purpose.  They were not seeking evidence of a crime or a violation of some regulation.  Cf. Chapman, 365 U.S. at 616-18 (striking down a warrantless entry by police to search for evidence of a crime); Camara v. Municipal Court, 387 U.S. 523, 535-39 (1967) (striking down some warrantless administrative searches).  Rather, they were acting as military leaders with at least two purposes related to their command function:  (1) to minimize possible adverse consequences -- loss of his living quarters and overcharging for damages to his apartment -- to a subordinate; and (2) maintaining a good relationship between the Air Force and the civilian community by assisting a landlord who did not want to pursue civil legal remedies against a military member.  Rigid application of Fourth Amendment case law from other jurisdictions to the conduct at issue would fail to account for MSgt Saganski's and TSgt Zenor's unique "official" duty, as senior NCOs, to be apprised of their subordinates' behavior and to look out for the well-being of their men and women.

In this context, MSgt Saganski and TSgt Zenor acted reasonably.[10]  Moreover, where, as here, command representatives

---

[10] Furthermore, United States v. Wilson, 472 F.2d 901, 902-03 (9th Cir. 1972), illustrates that an accused's conduct can diminish or extinguish a reasonable expectation of privacy such that consent by a landlord to a warrantless search can be reasonable under some circumstances.  After Wilson failed to pay his rent for two weeks, his landlord was informed that Wilson

entered a subordinate's off-base residence (1) in order to effectuate their command responsibilities, and (2) with no law enforcement purpose and no expectation that a crime had been committed, or that evidence would be found, it would be unreasonable to expect command representatives to seek a warrant prior to entering.  Indeed, under the facts of this case, it is unclear on what basis a warrant could have been obtained as the standard for obtaining a warrant is wholly unrelated to the impetus behind the NCOs' entry.  See Illinois v. Gates, 462 U.S. 213, 238 (1983) (concluding that a magistrate's probable cause

---

was gone and his return uncertain.  Id. at 902.  The landlord entered the apartment believing it was abandoned and found it in a similar state to Appellant's apartment -- in disarray, with clothing, electronics, and contraband lying around.  Id.  In upholding the landlord's entry, the United States Court of Appeals for the Ninth Circuit did not depend on the landlord's opinion as to whether the apartment was abandoned, require an express finding of abandonment, or even find the apartment abandoned.  Id. at 903 ("When Wilson departed his lodgings, leaving . . . the rent unpaid, he should not have been surprised at his landlord's visit.  The landlord saw explosives in plain view and considerable evidence of abandonment.").  Rather, it adopted a functional view of the Fourth Amendment and held that the "local law of real property does not provide the exclusive basis upon which to decide Fourth Amendment questions."  Id. at 902.  We do not decide whether Appellant's apartment was abandoned under Texas law, but recognize that, like in Wilson, by failing to pay the rent, damaging the apartment, and failing to respond to his landlord's inquiries, Appellant significantly diminished his expectation of privacy in the apartment.  See also Skinner v. Ry. Labor Execs' Ass'n, 489 U.S. 602, 627-28 (1989) (holding that expectations of privacy can be reasonable, but diminished, based upon conduct or status, and that a diminished expectation of privacy can be used in evaluating reasonableness).

17

determination must be supported by "a fair probability that contraband or evidence of a crime will be found in a particular place"). This is not to say that the degree of difficulty in obtaining a warrant justifies a warrantless entry in every case. However, where, as here, attempting to obtain a warrant is impracticable, and does not further the purposes of the Fourth Amendment it is unnecessary to try to get a warrant and the absence of one does not render a search unreasonable. See, e.g., Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 657, 655 (1989) ("neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance"); New Jersey v. T.L.O., 469 U.S. 325, 340–42 (1985) (recognizing that the warrant requirement is unsuited to certain environments).

We do not intend to create a broad military exception to the Fourth Amendment; rather, where: (1) command representatives are performing a command function; (2) a reasonable reading of the lease terms permits the landlord to enter; (3) military officials entered the premises at the behest of the landlord; and (4) the purpose of the entry is not for law enforcement purposes or a mere pretext for conducting a warrantless search, Jacobs's exception to the warrant requirement because the "search" is reasonable makes eminent sense. Under the circumstances of this case, the NCOs intrusion

18

into Appellant's apartment was not a violation of the Fourth

Amendment. Therefore, the military judge did not abuse his

discretion in refusing to suppress the AVVI.

## V. Conclusion

The judgment of the United States Air Force Court of

Criminal Appeals is affirmed.

<u>United States v. Irizarry</u>, No. 12-0451/AF

ERDMANN, Judge, with whom BAKER, Chief Judge, joins (dissenting in part and concurring in the result):

While I agree with many of the majority's preliminary holdings, I disagree with the ultimate holding that Irizarry's Fourth Amendment rights were not violated because the entry into his apartment was reasonable. I therefore respectfully dissent from that portion of the majority's opinion. I would also overrule <u>United States v. Jacobs</u>, 31 M.J. 138 (C.M.A. 1990), to the extent that it allows a landlord to consent to the entry of a government agent into a military member's apartment for any purpose which the landlord may also have a limited right of entry. However, since I believe that the circumstances of this case do not warrant the application of the exclusionary rule, I concur in the result.

## Background

Irizarry's landlord, Cedar Creek Apartments, contacted Irizarry in early February 2010 concerning his January rent. Irizarry insisted that he had paid his January rent and provided his money order stubs. Later Cedar Creek determined that Irizarry had attempted to pay his January rent, but that one of its employees had mistakenly failed to deposit the money order. Cedar Creek spoke with Irizarry again and he informed its representatives that he would trace his January money order and also pay his February rent on February 15. Irizarry did not pay

the February rent on February 15 nor did he provide any further information as to the January payment. Cedar Creek's further efforts to contact Irizarry were unsuccessful but at some point Cedar Creek determined from the Air Force that he was on leave.

Cedar Creek eventually elected to perform a "skip-check." As noted by the majority, during the "skip-check," a Cedar Creek maintenance worker discovered that the apartment was in "disarray." However, the maintenance worker also found toiletries in the apartment as well as items of value, including furniture, computer speakers, DVDs, and clothes. Based on the "skip-check," the landlord concluded that the apartment had not been abandoned, and the manager decided to contact the Air Force for assistance in getting Irizarry to clean up the unit and pay the overdue rent.

In response to the landlord's invitation to view the apartment, Irizarry's first sergeant and his immediate supervisor visited the apartment complex on February 23, and the manager consented to their entry into the apartment leased by Irizarry. While in the apartment the sergeants discovered the altimeter vertical velocity indicator (AVVI).

At trial Irizarry moved to suppress this evidence as the fruit of an unlawful search and seizure. The military judge initially found that the sergeants entered "in their official capacity" and that the inspection was "'government action'

2

sufficient to trigger the [Fourth] Amendment's protection against unreasonable searches." However, the military judge also found that "[b]y clear and convincing evidence, [Cedar Creek] had the authority to consent to [the sergeants] walking through the accused's apartment [and that its] purpose was to effectuate repairs upon the property, a purpose specifically listed in the lease at Paragraph 28." The military judge denied the motion to suppress the introduction of the AVVI, primarily relying on Jacobs.

## Discussion

The Fourth Amendment protects individuals from unreasonable intrusion only by government actors. United States v. Jacobsen, 466 U.S. 109, 113 (1984) (citing Walter v. United States, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). However, the protections of the Fourth Amendment are not limited to intrusions of a law enforcement nature. See O'Connor v. Ortega, 480 U.S. 709 (1987); New Jersey v. T.L.O., 469 U.S. 325 (1985). I agree with the majority's conclusion that the sergeants were "government agents" acting in their "official capacity" when they entered the apartment. United States v. Irizarry, __ M.J. __, __ (15) (C.A.A.F. 2013). Once this determination has been made, the relevant Fourth Amendment inquiry is whether Irizarry had a reasonable expectation of privacy and if he did, whether the Government intruded on that expectation in a way that was

United States v. Irizarry, No. 12-0451/AF

unreasonable.  See United States v. Michael, 66 M.J. 78, 80
(C.A.A.F. 2008) (citing United States v. Daniels, 60 M.J. 69, 71
(C.A.A.F. 2004)).

    1.  Reasonable Expectation of Privacy

    The majority concluded that Irizarry had a reasonable
expectation of privacy in his apartment and that a "search" in
the Fourth Amendment sense occurred.  I agree.  Despite this
holding, the majority goes on to hold that Irizarry had a
significantly diminished expectation of privacy because he
failed to pay the rent, damaged the apartment, and failed to
respond to his landlord's inquires.  Relying on United States v.
Wilson, 472 F.2d 901, 902 (9th Cir. 1972), the majority believes
that "an accused's conduct can diminish or extinguish a
reasonable expectation of privacy such that consent by a
landlord to a warrantless search can be reasonable under some
circumstances."  Irizarry, __ M.J. at __ (16 n.10).

    Wilson, however, simply stands for the principle that there
is no expectation of privacy in abandoned property -- a
principle that this court acknowledged in Michael, 66 M.J. at 80
n.4.  The phrase "diminished expectation of privacy" appears
nowhere in Wilson.  While under the facts presented in Wilson,
the court held that Wilson had abandoned the apartment, the

4

facts in this case do not support a similar result.[1]  In fact,
the Cedar Creek representatives testified that following the
"skip-check," they determined that Irizarry had not abandoned
the apartment.  In addition, the sergeants testified that they
believed the apartment was still Irizarry's residence and had
not been abandoned, and Cedar Creek believed "that the apartment
was not abandoned according to Texas state law or the terms of
the lease."

In addition to this testimony and the military judge's
findings, Irizarry had left toiletries in the apartment along
with clothes, furniture, and electronic equipment.  Unlike
Wilson, no one informed the landlord that Irizarry had moved
out.  While Cedar Creek had been unable to contact Irizarry,
both the Air Force and the landlord were aware he was away on
leave.  Under these circumstances Irizarry retained a reasonable
expectation of privacy in his off-base apartment and his
expectations of privacy were not diminished.[2]

---

[1] When Wilson's rent had not been paid his landlord asked the
neighbors as to his whereabouts and was informed that Wilson had
moved out and it was uncertain whether he would return.  Wilson,
472 F.2d at 901.  When the landlord went to the apartment he
found the door open and the apartment in disarray.  Id.  "Lying
about were some old clothing, a television set, pipe bombs,
blasting powder, and impact fuses."  Id.  The landlord nailed
the door shut and called the police.  Id.  The FBI seized the
explosives and after the agents obtained a search warrant, they
returned and searched the apartment.  Id.
[2] The majority also relies on Skinner v. Railroad Labor
Executives' Ass'n, 489 U.S. 602 (1989), in support of Irizarry's
alleged diminished expectation of privacy.  Skinner, however,

United States v. Irizarry, No. 12-0451/AF

## 2. Reasonableness of the Search

Under most circumstances, warrantless intrusion by the government is per se unreasonable. United States v. Weston, 67 M.J. 390, 392 (C.A.A.F. 2009) (citing Georgia v. Randolph, 547 U.S. 103, 109 (2006)). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo v. United States, 533 U.S. 27, 31 (2001). The majority opinion concludes that the sergeants' entry was nevertheless reasonable because the lease allowed the landlord to enter the apartment under certain circumstances and Jacobs authorized the landlord to consent to the entry of third parties when those circumstances existed.

## A. Supreme Court Authority

As this is an inquiry into the scope of the Fourth Amendment, the analysis of this issue must start with a review of relevant Supreme Court precedent. In Georgia v. Randolph, the Court reviewed a number of cases dealing with landlords or hotel managers allowing third parties into rented premises:

> A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. See Chapman v. United States, 365 U.S. 610 (1961) (landlord); Stoner v. California, 376 U.S. 483 (1964) (hotel manager). A

has nothing to do with the expectation of privacy in the home, but rather centers on the diminished expectation of railroad workers in the context of routine urinalysis "by reason of their participation in an industry that is regulated pervasively to ensure safety." Id. at 627.

6

>    tenant in the ordinary course does not take rented
>    premises subject to any formal or informal agreement
>    that the landlord may let visitors into the dwelling,
>    Chapman, supra, at 617, and a hotel guest customarily
>    has no reason to expect the manager to allow anyone
>    but his own employees into his room, see Stoner,
>    supra, at 489, see also United States v. Jeffers, 342
>    U.S. 48, 51 (1951) (hotel staff had access to room for
>    purposes of cleaning and maintenance, but no authority
>    to admit police).  In these circumstances, neither
>    state-law property rights, nor common contractual
>    arrangements, nor any other source points to a common
>    understanding of authority to admit third parties
>    generally without the consent of a person occupying
>    the premises.

547 U.S. at 112 (emphasis added).

While the majority recognizes this line of cases, it nonetheless concludes that "there is no Supreme Court precedent indicating that a landlord may never consent to entry for non-law enforcement purposes where state law and the lease allow." Irizarry, __ M.J. at __ (13).  While relying on the absence of Supreme Court precedent is questionable authority at best, we do in fact have a number of Supreme Court cases on this very point. In order to uphold a warrantless search by consent under those cases, the consent must be given either by the defendant or by one with common authority over the property to be searched. United States v. Matlock, 415 U.S. 164, 171 (1974).  The cases specifically reject the premise that state property law or lease

7

United States v. Irizarry, No. 12-0451/AF

agreements can substitute for that consent.  <u>Randolph</u>, 547 U.S.

at 112; <u>Matlock</u> 415 U.S. at 171 n.7; <u>Chapman</u>, 365 U.S. at 617.[3]

    While here the majority holds that the landlord did not

have common authority to grant consent to the sergeants' entry

into the apartment, it nevertheless concludes that this

authority is inapplicable and goes on to rely on the lease

provisions and <u>Jacobs</u> to find the search reasonable in a Fourth

Amendment context.  <u>Irizarry</u>, __ M.J. at __ (8-16).

  B.  <u>Lease Provisions</u>

    Even if it were necessary to turn to the lease, the lease

provisions do not provide authority for either the landlord or

the sergeants to enter the apartment under these circumstances.

paragraph 28 of the Lease Agreement provides, in pertinent part:

> WHEN WE MAY ENTER.  If you or any guest or occupant is
> present, then repairers, servicers, contractors, our
> representatives, or other persons listed in (2) below
> may peacefully enter the apartment at reasonable times
> for the purposes listed in (2) below.  If nobody is in
> the apartment, then such persons may enter peacefully
> and at reasonable times by duplicate or master key (or
> by breaking a window or other means when necessary)
> if:
>
> (1) written notice of the entry is left in a
> conspicuous place in the apartment immediately after
> the entry; <u>and</u>

---

[3] The majority distinguishes these cases on the basis that the entry in this case was not for a law enforcement purpose.  That distinction is unpersuasive for two reasons.  First, the protections of the Fourth Amendment are not limited to intrusions of a law enforcement nature.  <u>See</u> <u>O'Connor</u>, 480 U.S. at 714-15; <u>T.L.O.</u>, 469 U.S. at 335.  Second, a search is not less intrusive upon a citizen's protected privacy right simply because it did not occur with a law enforcement purpose in mind.

> (2) entry is for: . . . <u>making repairs or replacements</u>; <u>estimating repair or refurbishing costs</u>; . . . <u>doing preventative maintenance</u>; . . . <u>exercising our contractual lien</u>; . . . .

(Emphasis in second paragraph added.)

The findings and conclusions of the military judge that the landlord had the authority to consent to the sergeants' entry into Irizarry's apartment and that their purpose was to "effectuate repairs upon the property, a purpose specifically listed in the lease at paragraph 28," constitute an abuse of discretion. Assuming that "effectuate repairs" equates to "making repairs," neither the landlord nor the sergeants entered for that purpose. The landlord was there to try to get the Air Force to help in getting Irizarry to clean up the apartment and pay his back rent. The sergeants were there to gather information about the condition of the apartment, report back to the commander, and determine whether Irizarry needed to be counseled. As noted, Irizarry's first sergeant specifically testified on cross-examination that he did not intend to "actually perform repairs," to "draft up an estimate of the cost," or to do "any preventative maintenance."[4] Furthermore,

---

[4] Amicus argued that the landlord was authorized to enter the apartment under paragraph 13 of the lease because the rent was delinquent. Brief of Amicus Curiae at 8, <u>United States v. Irizarry</u>, No. 12-0451 (C.A.A.F. Oct. 29, 2012). However, paragraph 13 provides:

CONTRACTUAL LIEN AND PROPERTY LEFT IN APARTMENT.

the first sergeant had already explained to the landlord --

prior to entering the apartment -- that there was nothing that

the Air Force could do for Cedar Creek and that it would have to

pursue the issue through civilian channels.

The majority holds that the lease authorized the landlord

to invite the sergeants into the apartment "to assist them in

securing rent and repairs from Appellant -- something that

necessarily includes viewing the damage to estimate repair costs

. . . and determine how to counsel Appellant."  Irizarry, __

M.J. at __ (10-12).  In reaching this holding the majority

relies on paragraph 28 of the lease, but that provision does not

authorize the entry of the landlord or the sergeants in order to

secure rent.  Nor does it authorize the landlord or the

sergeants to enter to secure repairs from Irizarry rather than

to make repairs themselves.  Indeed, there is no provision in

the lease which authorizes entry for the purpose the majority

has identified.

---

. . . .

Removal After We Exercise Lien for Rent.  If your rent
is delinquent, our representative may peacefully enter
the apartment and remove and/or store all property
subject to lien.  Written notice of entry must be left
afterwards in the apartment in a conspicuous place --
plus a list of items removed.

Emphasis added.  Cedar Creek had not exercised a lien for
delinquent rent at the time of entry nor did it enter the
apartment to remove Irizarry's property.

The lease provisions must be interpreted under Texas law.[5] Texas law is consistent with most state law in requiring a court to initially look to the language of the lease. "We cannot ignore the clear language of an unambiguous contract. If the lease provision . . . can be given a certain or definite meaning or interpretation, it is not ambiguous, and we must simply apply the language in the lease." Cammack the Cook, L.L.C. v. Eastburn, 296 S.W.3d 884, 891 (Tex. App. 2009) (citations omitted). None of the lease terms authorize the landlord to enter the apartment or to bring third parties into the apartment for assistance in getting a tenant to pay back rent or to pay for repairs.

However, where the lease terms are ambiguous, the terms of the lease are to be construed in favor of the tenant. ABS Sherman Props., Ltd. v. Sarris, 626 S.W.2d 538, 540 (Tex. App. 1981).[6] Here the lease terms are not ambiguous and do not authorize entry of either the landlord or third parties for the purposes at issue. However, to the degree the terms of the

---

[5] I agree with the majority that an analysis of Texas case law is irrelevant to the Fourth Amendment inquiry. Irizarry, __ M.J. at __ (12 n.6). I rely on Supreme Court precedent for my Fourth Amendment analysis and focus on the terms of the lease and Texas case law only to the degree they are relevant to interpretation of the lease provisions and to the majority's Jacobs's analysis.

[6] See also Buffalo Pipeline Co. v. Bell, 694 S.W.2d 592, 598 (Tex. App. 1985) ("In Texas, it is established that a lease will be most strongly construed against the lessor. . . .").

United States v. Irizarry, No. 12-0451/AF

lease may be ambiguous, they must be resolved in favor of the tenant rather than the landlord.[7]  In holding that the lease terms authorized the entry, the majority improperly resolves the ambiguity in favor of the landlord, at the expense of Irizarry's Fourth Amendment rights.

    C.  United States v. Jacobs

    The majority goes on to rely on Jacobs as authority for its holding that the lease authorized the landlord to invite the sergeants into the apartment.  In Jacobs, we held that an Air Force sergeant who entered an airman's apartment at the invitation of the landlord to remedy an emergency situation did not violate the Fourth Amendment.  31 M.J. at 144.  We agreed with the "implied finding" of the CCA that an emergency situation existed and specifically held that "no Fourth Amendment violation occurs when a police officer enters a tenant's apartment in such circumstances at the behest of the landlord and discovers evidence of crime in plain view."  Id. We noted that "[b]oth the lease agreement and applicable California law" explicitly allowed the landlord to enter to make

_____

[7] The majority cites several Texas cases for the principle that "an accused can knowingly and voluntarily contract to allow third parties to enter a space where the accused has a reasonable expectation of privacy."  Irizarry, __ M.J. at __ (11).  I agree with that principle and note that Irizarry contracted to allow the landlord entry into his apartment for the specific purposes listed in paragraphs 13 and 28 of the lease -- none of which authorized the entry of either the landlord or the sergeants in this case.

12

United States v. Irizarry, No. 12-0451/AF

emergency repairs and held that law enforcement may enter "'in the shoes' of the landlord to assist him in making emergency repairs." Id. at 143-44 (footnotes omitted) (citing United States v. Sledge, 650 F.2d 1075, 1080 n.10 (9th Cir. 1981)).

Here, neither Texas law nor the lease provisions provide a basis for this entry of the landlord or the sergeants. But even if the sergeants had entered for a purpose allowed under the lease, I do not believe that the "in the shoes" doctrine adopted in Jacobs is good law. Jacobs relied on a footnote in Sledge, as authority for the "in the shoes" doctrine. Jacobs, 31 M.J. at 144. The relevant language in that footnote states that:

> [I]t is the ordinary rule that a relation between a
> third party and a defendant of landlord-lessee,
> without more, does not actually authorize the third-
> party landlord to consent to a search of the demised
> premises during the period of the defendant-tenant's
> occupancy or tenancy. However, coexistent with this
> rule is the principle applied to cases in which some
> third party has actual authority for a limited access
> to the defendant's premises, and that access is
> sufficient to include plain sight of the incriminating
> evidence within its scope. Such cases have sometimes
> held that the police have the authority to stand in
> the shoes of that third party.

Sledge, 650 F. 2d at 1080 n.10 (emphasis added) (citations omitted).

However, none of the four cases cited in the Sledge footnote for the "in the shoes" doctrine actually support that theory. United States v. Gradowski, 502 F.2d 563, 564 (2d Cir. 1974), affirmed the search of a car in a one paragraph per

13

curiam opinion on the basis that "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." Both United States v. Hersh, 464 F.2d 228, 229-30 (9th Cir. 1972), and Wilson v. Health & Hosp. Corp. of Marion County, 620 F.2d 1201, 1210 (7th Cir. 1980), simply restate the plain view doctrine and reiterate it does not justify a warrantless entry in the first place. Finally, in Wilson, 472 F.2d at 902, the court concluded that a landlord had a right to allow law enforcement to enter leased property because the apartment and the property within it were abandoned and there is "nothing unlawful in the Government's appropriation of such abandoned property." Id. (quoting Abel v. United States, 362 U.S. 217, 241 (1960)). None of the cited cases discussed or even mentioned an "in the shoes" doctrine.

I am not aware of any other circuit which has adopted the "in the shoes" theory of the authority of a landlord to consent to a government agent's search of an individual's apartment, and the doctrine is contradicted by a later case out of the United States Court of Appeals for the Ninth Circuit. See United States v. Warner, 843 F.2d 401, 403 (9th Cir. 1988).[8]

---

[8] In Warner the landlord had limited access to the leased premises. Warner, 843 F.2d at 403. While mowing the lawn he noticed a pungent chemical smell and called the police and asked

United States v. Irizarry, No. 12-0451/AF

Furthermore, the doctrine is inconsistent with Supreme Court precedent discussed supra recognizing that landlords have no actual authority to consent to government intrusions into the privacy of their tenants, and that consent must be based on "common authority." Randolph, 547 U.S. at 110-13; Matlock, 415 U.S. at 169-71 & n.7.

It is difficult to envision a situation where the sergeants -- who the majority recognizes were there in their official capacity as representatives of the U.S. Air Force -- can at the same time be representatives of the landlord to further its commercial interests.[9] I would therefore overrule Jacobs to the extent that it allows a landlord to consent to a government entry for any purpose which the landlord may also have a limited right of entry.

D. Reasonableness of Entry as Command Representative

The majority also holds that the sergeants' entry into the apartment was reasonable due to the fact that they were

---

that someone from an appropriate agency come to check out the situation, but that it was not an emergency. Id. at 402. A police officer arrived and the landlord unlocked the garage, where they discovered chemicals that are used in the manufacture of drugs. Id. The drugs were seized, but the Ninth Circuit held that the landlord could not consent to the search and upheld the district court's order suppressing the evidence. Id. at 403, 405.

[9] This is particularly true in this case, where the first sergeant had already explained to Cedar Creek, prior to entering the apartment, that there was nothing that the Air Force could do and that it would have to pursue the issue through civilian channels.

15

effectuating their command responsibilities with no law enforcement purpose and no expectation that a crime had been committed or evidence would be found.  Irizarry, __ M.J. at __ (16-18).  Under these circumstances the majority concludes it would be unreasonable to expect the sergeants to obtain a warrant -- thus the warrantless entry was reasonable.  I cannot agree that the degree of difficulty in obtaining a warrant can somehow justify a subsequent warrantless entry.  The issue that we are called upon to decide is whether the sergeants' warrantless entry into the apartment was reasonable.  The fact that there was no warrant frames the issue but does not justify the entry.

It is not clear whether this discussion of the reasonableness of the entry under a "command representative" theory is an independent basis supporting the reasonableness of the entry or is included for its cumulative effect with the "in the shoes" theory.  Under either theory the holding is an unwarranted extension of this court's Fourth Amendment jurisprudence.

I am uncomfortable with what appears to be a unique military exception to the Fourth Amendment, which gives military personnel essentially carte blanche authority to enter a subordinate's off-base residence:  (1) at the invitation of the landlord; (2) when the purpose of the entry effectuates a

command responsibility; and (3) the entry has no explicit law enforcement purpose at the outset.  Irizarry, __ M.J. at __ (17-19).  Such a sweeping exception invites substantial abuse of the privacy interests of military members and their families, many of whom may live off base for the very purpose of obtaining a greater sense of privacy.

In conclusion, there is no legal basis for the majority's holding that the sergeants' entry and search of Irizarry's off-base apartment was reasonable for Fourth Amendment purposes. For that reason, I dissent from that portion of the majority's opinion.

## 3. Exclusionary Rule

While I dissent from the majority's Fourth Amendment analysis and conclusion, I concur in the ultimate result in the case because "[t]he [Fourth] Amendment says nothing about suppressing evidence obtained in violation of [its] command. That rule -- the exclusionary rule -- is a 'prudential' doctrine," Davis v. United States, 131 S. Ct. 2419, 2426 (2011) (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998), "created by [the Supreme] Court to 'compel respect for the constitutional guaranty.'"  Id. (quoting Elkins v. United States, 364 U.S. 206, 217 (1960)).  The Supreme Court has "repeatedly held" that the rule's sole purpose is to "deter future Fourth Amendment violations."  Id. (citing Herring v.

United States v. Irizarry, No. 12-0451/AF

United States, 555 U.S. 135, 141 & n.2 (2009); United States v. Leon, 468 U.S. 897, 909, 921 n.22 (1984); Elkins, 364 U.S. at 217). "Real deterrent value is a 'necessary condition for exclusion' . . . ." Id. at 2427 (quoting Hudson v. Michigan, 547 U.S. 586, 596 (2006)).

This court has also noted that "[u]nwarranted application of the [exclusionary] rule can result in a disparity between the error committed by the police and the windfall afforded the accused." United States v. Khamsouk, 57 M.J. 282, 292 (C.A.A.F. 2002). "The fundamental purpose of the exclusionary rule is to deter improper law enforcement conduct." United States v. Conklin, 63 M.J. 333, 340 (C.A.A.F. 2006). "[D]espite its broad purpose, 'the rule does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons, . . . but applies only in contexts where its remedial objectives are thought most efficaciously served.'" Khamsouk, 57 M.J. at 292 (quoting Pennsylvania Bd. of Probation and Parole, 524 U.S. at 363). In this case I see no deterrent benefit resulting from the imposition of the exclusionary rule, and I would therefore decline to apply it.

The critical factor in reaching this conclusion is that the sergeants did not enter for the purpose of conducting a criminal investigation or for the purpose of searching for evidence that might later be utilized against Irizarry at a court-martial,

United States v. Irizarry, No. 12-0451/AF

disciplinary hearing, or other legal proceeding.  Therefore, suppressing the evidence they unexpectedly discovered would not thwart their initial purpose for entering the apartment, so as to discourage entry under similar circumstances in the future.  Their uncontroverted purpose was to assess the scope of the damage to the apartment, possibly protect Irizarry from legal action by the landlord, protect the Air Force's relationship with the local civilian community, and to report back to command on the situation.  None of these purposes constitute police misconduct that the exclusionary rule was designed to or is capable of deterring.

Irizarry argues, however, that Military Rule of Evidence (M.R.E.) 311 mandates exclusion of evidence regardless of whether exclusion has any deterrent effect.  A premise of this argument is that the President has adopted a more restrictive exclusionary rule for courts-martial than the judicially created exclusionary rule adopted for the Fourth Amendment.  While I agree with Irizarry that the President could adopt such a rule if he chose, I am not convinced that he has done so.

M.R.E. 311–M.R.E. 317 are intended to "express the manner in which the Fourth Amendment to the Constitution of the United States applies to trials by court-martial."  Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-17 (2012 ed.) [hereinafter Drafters'

19

United States v. Irizarry, No. 12-0451/AF

Analysis]. I read this language to reflect the President's intent that M.R.E. 311-M.R.E. 317 be interpreted in light of federal Fourth Amendment case law, including the exclusionary rule. This inference is strengthened by the frequent amendments to the rule which mirror developments in Fourth Amendment jurisprudence in the federal courts. See generally Drafters' Analysis at A22-17 to A22-31 (identifying changes in M.R.E. 311-M.R.E. 317 to conform to federal Fourth Amendment jurisprudence). In addition, this court has previously remarked on the deterrent purpose of the exclusionary rule in military cases. See Conklin, 63 M.J. at 340; Khamsouk, 57 M.J. at 292; see also United States v. Leedy, 65 M.J. 208, 219-20 (C.A.A.F. 2007) (Erdmann, J., concurring). In the absence of a clear statement from the President, I decline to read M.R.E. 311 as more restrictive than the federal courts' Fourth Amendment jurisprudence.

## Conclusion

The search of Irizarry's off-base apartment by his military supervisors violated the Fourth Amendment, but application of the exclusionary rule under these circumstances would not promote further compliance with the Fourth Amendment. I therefore join in the result reached by the majority.