*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, STEWART, and HOUTZ
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Yusif M. MCCALL**
Corporal (E-4), U.S. Marine Corps
*Appellant*

**No. 201900225**

Decided: 29 April 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Warren A. Record (arraignment and motions)
Michael D. Libretto (trial)

Sentence adjudged 24 April 2019 by a general court-martial convened at Marine Corps Recruit Depot Parris Island, South Carolina, consisting of a military judge sitting alone. Sentence approved by the convening authority: reduction to E-1, confinement for 19 months, and a bad-conduct discharge.

For Appellant:
*Captain Valonne L. Ehrhardt, USMC*

For Appellee:
*Lieutenant Jennifer Joseph, JAGC, USN*
*Lieutenant Kimberly Rios, JAGC, USN*

Senior Judge GASTON delivered the opinion of the Court, in which Judges STEWART and HOUTZ joined.

———————————————

## PUBLISHED OPINION OF THE COURT

———————————————

GASTON, Senior Judge:

Appellant was convicted, contrary to his pleas, of conspiracy to possess, introduce, and distribute marijuana; absence without leave; violation of a lawful general order by wrongfully possessing drug abuse paraphernalia; wrongful introduction of marijuana with intent to distribute; and wrongful use of marijuana; in violation of Articles 81, 86, 92, and 112a, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 881, 886, 892, 912a.

He asserts eight assignments of error [AOEs], which we renumber as follows: (1) his trial defense counsel were constitutionally ineffective for failing to investigate or move to suppress evidence obtained during the search of Appellant's off-base apartment; (2) the military judge erred by allowing argument that evidence that Appellant committed various drug offenses under Charge I could be used to prove his propensity to wrongfully possess drug abuse paraphernalia under Charge II, contrary to *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016); (3) the evidence is legally and factually insufficient to support his convictions of wrongful introduction of marijuana with intent to distribute and conspiracy to possess, introduce, and distribute marijuana, as well as (4) wrongful use of marijuana, and (5) violating a lawful general order by wrongfully possessing drug abuse paraphernalia; (6) his sentence to a bad-conduct discharge is inappropriately severe; (7) the promulgating order does not reflect Appellant's acquittal of wrongful manufacture of marijuana with intent to distribute; and (8) the military judge erred in denying the Defense request for an expert in forensic psychology when the evidence raised the defense of duress to the unauthorized absence charge.[1]

In an opinion published on 19 February 2021, we found merit in Appellant's first AOE without first obtaining responses from Appellant's trial defense counsel regarding his allegation of ineffective assistance of counsel, as required by *United States v. Melson*, 66 M.J. 346, 350-51 (C.A.A.F. 2008). We granted the Government's motion for reconsideration on this issue,

———————————————

[1] We have considered this final AOE and find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

ordered and received responsive declarations from the counsel, and withdrew our prior opinion. Having considered this additional evidence, we still find merit in Appellant's first AOE and set aside his conviction for violating a lawful general order by wrongfully possessing drug abuse paraphernalia under Charge II, which moots his second and fifth AOEs. We also find merit in his seventh AOE and order corrective action in our decretal paragraph. We affirm the remaining findings and, upon reassessment, affirm the sentence.

## I. BACKGROUND

After his on-base driving privileges were suspended, Appellant began getting rides to work from Mr. Lima.[2] One day, when he and Mr. Lima entered the gate at Marine Corps Air Station [MCAS] Beaufort, South Carolina, the gate guard noticed that they appeared nervous and fidgety. Mr. Lima's license plate was flagged as having lapsed vehicle insurance, and an MCAS police officer pulled the car over. When he asked Mr. Lima for his license and registration, the officer noticed Mr. Lima and Appellant look at each other and then Appellant slid forward in the passenger seat and used his knees to prevent the glove compartment from opening all the way when Mr. Lima retrieved his registration from inside.

When Mr. Lima failed to provide proof of insurance, the officer had him get out of the car, at which point he noted a strong odor of marijuana. The officer had Appellant get out and searched the vehicle, finding that the glove compartment was now locked. A drug-detection dog was employed, but failed to alert while searching the vehicle. The officer then found a key in Mr. Lima's pocket and used it to open the glove compartment. Inside were a pill bottle containing what was later determined to be amphetamine; over 130 grams of marijuana contained in a large, vacuum-sealed bag and in four individually-wrapped, smaller plastic bags inside a mason jar; additional small plastic bags; and Appellant's debit card.

Appellant was ordered to undergo a urinalysis at his command later that day. After two weeks, the results came back positive for the metabolite of tetrahydrocannabinol [THC], the principal psychoactive ingredient in marijuana. A Government expert testified at trial that the level of THC metabolite found in Appellant's urine was consistent with marijuana use within three to five days of the urinalysis.

---

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

After learning of his positive urinalysis, Appellant stopped reporting for duty. This prompted Gunnery Sergeant [GySgt] Hotel from Appellant's command to go to Appellant's off-base apartment to check on him. When GySgt Hotel knocked on Appellant's door and received no response, he spoke to an employee at the apartment complex's housing office, Ms. Helo, who, following the company's protocol, called the local police to accompany them on the welfare check. When the police arrived, the group tried knocking on the door again and after receiving no response left the area. The following day, when GySgt Hotel returned with Ms. Helo and the police to again knock on Appellant's door, they again received no response, but a few minutes later saw Appellant fleeing down a stairwell at the back end of the breezeway.

The next day, GySgt Hotel returned a third time to Appellant's apartment with Ms. Helo and local police. This time, when knocking on Appellant's door garnered no response, the group had Ms. Helo unlock the door and the police went inside and looked around the apartment while GySgt Hotel and Ms. Helo remained outside. There was an odor of marijuana emanating from Appellant's bedroom, and when the police looked inside Appellant's bedroom closet they found a hydroponic "grow system"—a plastic tub with a grow lamp above it inside a tent—without any dirt or plants in it. The police then invited GySgt Hotel and Ms. Helo into the apartment to show them the grow system, which they both photographed.

Appellant's trial defense counsel filed various motions prior to trial. They requested and were granted a mental health examination under Rule for Courts-Martial [RCM] 706, which diagnosed Appellant with Post-Traumatic Stress Disorder [PTSD] and an unspecified mood disorder, but found him mentally competent at the time of the alleged offenses and mentally able to assist in his defense. The Defense also filed motions to compel a forensic psychologist to explore the defense of lack of mental responsibility and to suppress evidence obtained during the traffic stop, both of which the military judge denied. The Defense did not move pretrial to suppress any evidence obtained from Appellant's apartment.

At trial, Appellant's civilian defense counsel [CDC] orally moved to suppress the photo of the grow system introduced through the testimony of GySgt Hotel. In support of his motion, the CDC argued that during cross-examination GySgt Hotel had responded in the negative and laughed when asked whether the reason he looked inside Appellant's bedroom closet was to see whether Appellant had committed suicide. CDC argued that since GySgt Hotel found the possibility of finding Appellant in the closet laughable, this demonstrated that the "health and welfare" check at Appellant's apartment was a mere pretext for searching it. After reviewing the pertinent discovery provided to the Defense prior to entry of pleas, the military judge

found the Defense had not established good cause to litigate the motion mid-trial and denied it as untimely.

Mr. Lima testified at trial that he had given Appellant rides to work multiple times and that Appellant had given him his debit card to use for gas and food in exchange for rides to work. He testified that Appellant was unaware of the drugs found in the glove compartment, which Mr. Lima maintained had remained locked until the police opened it. He testified that he kept his registration in his car's middle console and that he never opened the glove compartment during the traffic stop.

Appellant testified at trial that during the traffic stop Mr. Lima had indeed opened the glove compartment to retrieve his vehicle registration, but that he had scooted his knees back, not forward, to make room when Mr. Lima did so. He testified that after Mr. Lima opened the glove compartment to get his registration, he did not see anyone lock it. He testified that he was unaware of the drugs found in it. He testified that he did not knowingly ingest marijuana prior to his urinalysis, but that he had eaten some food at a party a week or so before that had made him feel sick to his stomach. He testified that he stopped going to work after finding out about his positive urinalysis, and then fled when his command came to his apartment, because he was afraid he would kill somebody or himself. He testified that the gardening grow system found in his closet was worth over $1,000 and that he intended to use it to grow legal fruits and flowers in his apartment as the weather got colder.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

Appellant asserts his trial defense counsel were ineffective for failing to investigate and timely move to suppress the evidence obtained from his apartment—specifically, the photo of the grow system found in his bedroom closet—as the fruits of an unlawful search. We review claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted). Our review uses the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "In order to prevail on a claim of ineffective assistance of counsel [IAC], an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

Our review "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 at 689. When an IAC claim is premised on trial defense counsel's failure

to move the court to take some action, "an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citation and internal quotation marks omitted). "Failure to raise a meritless argument does not constitute ineffective assistance." *United States v. Napoleon*, 46 M.J. 279, 284 (C.A.A.F. 1997) (quoting *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)). With respect to whether the asserted deficiency resulted in prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

While we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, we find CDC's performance in this instance to be deficient for a number of reasons. First, it is well-settled that motions to suppress evidence must be made before pleas are entered, absent a showing of good cause. RCM 905(b)(3), 905(e). Whether good cause exists largely depends on when the Defense acquired the necessary information to know about the evidence at issue and the basis for suppressing it. Not learning about the basis for a motion to suppress until after pleas are entered can constitute good cause, which "should be liberally construed in favor of permitting an accused the right to be heard *fully* in his defense." *United States v. Coffin*, 25 M.J. 32, 34 (C.M.A. 1987) (emphasis in original). On the other hand, it is not good cause "when the defense knew or could have known about the evidence in question" prior to the relevant deadline. *United States v. Jameson*, 65 M.J. 160, 163 (C.A.A.F. 2007).

Like the military judge, we find CDC's mid-trial claim of surprise unsupported by the evidence. At trial, CDC stated he believed that GySgt Hotel's visit to Appellant's apartment was a legitimate "health and welfare" inspection until GySgt Hotel laughed during his testimony about not expecting to find Appellant dead from suicide when he looked inside Appellant's bedroom closet. He told the military judge, "[W]e had no idea that the idea of Corporal McCall having been in the closet, having committed suicide, was laughable. I asked a question expecting the answer to be yes. We thought it was a possibility."[3] As discussed in the declarations submitted by CDC and his co-counsel, CDC states GySgt Hotel told the Defense during pretrial interviews that "he was present at the apartment on multiple occasions because he was concerned that the Accused had taken his own life," and thus his trial testi-

---

[3] R. at 447.

mony "differed in both substance and demeanor from his statements before trial."[4]

But when pressed by the military judge at trial, CDC conceded that the narrow issue he was asserting was not about GySgt Hotel's presence *at* Appellant's apartment; rather, it was specifically about his entry *into* the apartment to look in the closet, which CDC argued the trial testimony made him realize "was not authorized, and it was pre-textual."[5] Because a written motion was not filed, the record is ill-developed even to the point of ascertaining whether it was Appellant's commander who ordered the "health and welfare" check, or whether GySgt Hotel simply took it upon himself to conduct one. However, regarding the narrow issue asserted at trial, based on the pretrial discovery provided to the Defense and later submitted to the court, the record is clear: the Defense was already aware that, consistent with his trial testimony, GySgt Hotel remained outside Appellant's apartment on the day in question until the local police told him "to check out the hydroponic system in [Appellant's] room."[6] With respect to this crucial issue, on which the defense counsel's declarations are silent, we agree with the military judge's decision to "not find that [GySgt Hotel's] response [at trial], taken into context with the narrow scope of the question, and together with [GySgt Hotel's] summary of interview provided to the Defense, materially changes the body of relevant evidence that would give rise to this motion or objection to the evidence, evidence that the Defense was aware of prior to the entry of pleas."[7] Thus, the military judge properly found a lack of good cause in denying the mid-trial suppression motion as untimely.

Second, we are unable to ascertain how CDC believed Appellant's private, off-base apartment—let alone his bedroom closet—could be lawfully subjected

---

[4] Appellee's Resp. to the Court's Order of 2 April 2021, App. A, at 2.

[5] R. at 461-62.

[6] App. Ex. XXXIV, at 1. In the same summary of interview provided in discovery, the Defense was made aware that GySgt Hotel told the trial counsel he had seen Appellant, in apparently good physical health, running away from him the day before the search yielding the evidence at issue; that Appellant later told GySgt Hotel he ran away not for any asserted mental health issue, but because he did not want to go to jail; and that while there were mental health issues associated in the case (including an RCM 706 examination that found Appellant both mentally responsible at the time of the offenses and mentally competent to stand trial), GySgt Hotel himself believed Appellant kept "crying wolf" about suicide. *Id.*

[7] R. at 498-99.

to a health and welfare inspection in this manner, even prior to GySgt Hotel's trial testimony. A "lawful inspection" is

> an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle . . . conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle.

Military Rule of Evidence [MRE] 313(b). While such inspections may include "an examination to determine and to ensure . . . that personnel are present, fit, and ready for duty," in order to be lawful, they "must be conducted in a reasonable fashion." MRE 313(b).

Military inspections are premised on the idea that "during a legitimate health and welfare inspection, the area of the inspection becomes 'public' as to the commander, for no privacy from the commander may be expected within the range of the inspection." *United States v. Middleton*, 10 M.J. 123, 129 (C.M.A. 1981). To that end, such warrantless intrusions into living quarters have traditionally been allowed for barracks rooms or other military property. *See, e.g., United States v. Jackson*, 48 M.J. 292 (C.A.A.F. 1998). *United States v. Brown*, 12 M.J. 420 (C.M.A. 1982); *Middleton*, 10 M.J. at 127. But absent some extraordinary circumstance not present here, the ability to conduct such command-directed inspections does not generally extend to service members' private, off-base residences, which would create the sort of "broad military exception to the Fourth Amendment" that our superior court has squarely rejected. *United States v. Irizarry*, 72 M.J. 100, 107 (C.A.A.F. 2013) (finding military inspection lawful where landlord requested that the tenant's command inspect the condition of service member's off-base apartment in order to convince him to pay past-due rent and repair costs); *see also Donnelly v. United States*, 525 F. Supp. 1230, 1233 (E.D. Va. 1981) (finding military inspection lawful where off-base apartments were rented by the Navy under lease granting the Navy complete control and right to inspect).

Based on the record before us, we conclude that raising a timely motion to suppress the evidence obtained from Appellant's apartment would not have been meritless. The evidence would have shown this "health and welfare" check to be, at best, an improper intrusion into a private, off-base dwelling in which Appellant retained a reasonable expectation of privacy, and at worst, a mere subterfuge for an unlawful search for evidence of illegal drug-related misconduct. *See United States v. Thatcher*, 28 M.J. 20, 24 (C.M.A. 1989) ("[I]f an intrusion on privacy is really an 'inspection' and complies with MRE 313, no reasonable expectation of privacy has been violated; but if the purported

inspection is only a subterfuge for a search or is not properly conducted, then a violation has occurred.").

We reach the same conclusion even if we were to construe what occurred not as an inspection but as an "emergency search[ ] . . . of property conducted to save life or for a related purposes" under MRE 314(i). In order for the emergency doctrine to apply, the search must be "conducted in a good faith effort to render immediate medical aid, to obtain information that will assist in the rendering of such aid, or to prevent immediate or ongoing personal injury." *Id.* The focus of the inquiry is thus on the subjective belief of the individuals conducting the search. *United States v. Muniz*, 23 M.J. 201, 209 (C.M.A. 1987). Here, GySgt Hotel had seen Appellant, apparently healthy, the day before he secured the assistance of Ms. Helo and local police to successfully enter and search Appellant's apartment; he subjectively *disbelieved* Appellant was suicidal;[8] and he ultimately went inside the apartment, not in an effort to render immediate medical aid, to obtain information to assist in the rendering of such aid, or to prevent immediate or ongoing personal injury to Appellant, but at the invitation of the police to examine evidence of possible marijuana manufacture they had found, in a case where Appellant had a positive THC urinalysis and two weeks earlier had been caught introducing a large quantity of marijuana onto a military installation.[9] This evidence does not satisfy the requirements of MRE 314(i). *Cf. United States v. Korda*, 36 M.J. 578, 582 (A.F. Ct. Crim. App. 1992) (finding MRE 314(i) applicable where entry into off-base apartment was to retrieve a suicide note, which the command member subjectively believed would assist in providing aid to the missing service member or preventing his suicide).

Accordingly, we conclude the entry into Appellant's apartment was unlawful and would have been found so at trial. We further conclude that under the circumstances a timely motion to suppress would have shown that "exclusion of the evidence [would] result[ ] in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence [would]

---

[8] While we recognize the discrepancy between what GySgt Hotel reportedly told the trial counsel versus the defense counsel on this issue, based on the discovery provided to the Defense (which could have been used for impeachment as necessary), GySgt Hotel's belief was that Appellant had previously "claimed" he was suicidal, had said he was "joking about being suicidal, although the command takes the threats seriously," and had continued "crying wolf" on that issue. App. Ex. XXXIV at 1.

[9] GySgt Hotel testified at trial about his familiarity with hydroponic grow systems and their use in marijuana manufacture.

outweigh the costs to the justice system." MRE 311(a)(3). To hold otherwise on these facts would essentially grant military commands carte blanche to "inspect" the private, off-base homes of every command member who failed to show up to work for a period of time, which is precisely the sort of "broad military exception to the Fourth Amendment" our superior court has rejected. *Irizarry*, 72 M.J. at 107. And while we recognize that MRE 314(i) may afford warrantless entry into private, off-base homes in cases of bona fide emergencies, we find insufficient basis to conclude that was the case here.

Finally, with respect to whether counsel's deficiency resulted in prejudice, we conclude there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. The evidence of the grow system found in Appellant's apartment was the *sine qua non* for his conviction of possession of drug abuse paraphernalia under Sec'y of the Navy Inst. 5300.28E (May 23, 2011), in violation of Article 92, UCMJ. We therefore conclude we must set aside the finding of guilty for this specification and Charge II, which we accomplish in our decretal paragraph below.[10]

## B. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support several of his convictions. We review such questions de novo. UCMJ art. 66(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (internal citations omitted).

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence

---

[10] This conclusion moots Appellant's second and fifth AOEs.

constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

*1. Wrongful introduction of marijuana with intent to distribute and conspiracy to possess, introduce, and distribute marijuana*

In Specification 1 of Charge I and the Specification of Charge III, Appellant was convicted of wrongful introduction of marijuana with intent to distribute and conspiracy to possess, introduce, and distribute marijuana, in connection with the large quantity of marijuana transported onto MCAS Beaufort in the glove compartment of Mr. Lima's car. Appellant argues that based on his own testimony and that of Mr. Lima, he was unaware of the marijuana in Mr. Lima's glove compartment; hence, the evidence does not establish beyond a reasonable doubt that he wrongfully introduced marijuana onto MCAS Beaufort, intended to distribute it, or formed an agreement with Mr. Lima to possess, introduce, or distribute it. We disagree.

In order to prove the offense of wrongful introduction of marijuana with intent to distribute, the Government was required to prove beyond a reasonable doubt that (a) Appellant introduced some amount of marijuana onto MCAS Beaufort; (b) the introduction was wrongful; and (c) the introduction was with the intent to distribute. *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*], pt. IV, para. 37.b.(6). A person may be found criminally liable as a principal if he "commits [the] offense . . . or aids, abets, counsels, commands, or procures its commission." UCMJ art. 77(1). "Mere presence at the scene of a crime does not make one a principal" unless further requirements are met, such as "assist[ing] . . . in the commission of the offense" and "[s]har[ing] in the criminal purpose or design." *MCM*, pt. IV, para. 1.b.(2)-(3).

With respect to the element of wrongfulness, knowledge and intent can be established by circumstantial evidence. *United States v. Young*, 64 M.J. 404, 407 (C.A.A.F. 2007); *United States v. Lyons*, 33 M.J. 88, 89-90 (C.M.A. 1991); *United States v. Polk*, 48 C.M.R. 993, 996 (A.F.C.M.R. 1974). Similarly, in establishing "knowing and conscious" possession of a controlled substance, "[a]wareness of the presence of a controlled substance may be inferred from circumstantial evidence." *MCM*, pt. IV, para. 37.c.(2); *see also United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980) ("There must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an incidental bystander."). Additionally, "[i]ntent to distribute may be inferred from circumstantial evidence . . . [such as] possession of a quantity of substance in excess of that

which one would be likely to have for personal use . . . [and] the manner in which the substance is packaged . . . ." *MCM*, pt. IV, para. 37.c.(6).

In order to prove the offense of conspiracy to possess, introduce, and distribute marijuana, the Government was required to prove beyond a reasonable doubt that (a) Appellant entered into an agreement with Mr. Lima to wrongfully possess, introduce, and distribute marijuana; and (b) while the agreement continued to exist, and while Appellant remained a party to the agreement, he and Mr. Lima performed an overt act for the purpose of bringing about the object of the conspiracy—i.e., they introduced marijuana packaged in separate plastic bags in Mr. Lima's vehicle onto MCAS Beaufort. *See MCM*, pt. IV, para. 5.b.(1). The evidence must demonstrate that Appellant "possessed the mental state required for the offense[s] which w[ere] the object of the criminal conspiracy." *United States v. Wright*, 42 M.J. 163, 166 (C.A.A.F. 1995) (citations omitted). Mere association with the person who was part of the conspiracy or mere presence when the crime was committed is insufficient. *United States v. Mukes*, 18 M.J. 358, 359 (C.M.A. 1984). "The agreement in a conspiracy need not be in any particular form or manifested in any formal words. It is sufficient if the minds of the parties arrive at a common understanding to accomplish the object of the conspiracy, and this may be shown by the conduct of the parties." *MCM*, pt. IV, para. 5.c.(2).

Here, the evidence supports not only that Appellant knew the marijuana was in the glove compartment, but that he and Mr. Lima had formed an agreement to wrongfully possess, introduce, and distribute it, and were acting in concert in bringing it onboard MCAS Beaufort with the intent of distributing it—all of which can be established by circumstantial evidence. Nervous and fidgety at the gate, Appellant and Mr. Lima exchanged looks after Mr. Lima was pulled over and asked to provide registration for the vehicle. Appellant then used his knees to prevent the glove compartment from opening fully when Mr. Lima retrieved his registration document for the patrol officer. There was a strong odor of marijuana in the car itself. And after Mr. Lima retrieved his registration from the glove compartment, someone locked it again (while Appellant was in the passenger seat) before the police began searching the car. This evidence supports not only that Appellant knew there was marijuana in the glove compartment, but was actively engaged in trying to prevent it from being discovered during the traffic stop, and his debit card was found next to it. The large quantity and packaging of the marijuana into smaller, individually-wrapped bags, with additional plastic bags close by, further supports that the marijuana was intended for distribution, not personal consumption.

The highly probative nature of this circumstantial evidence leads us to discount the testimony of Appellant and Mr. Lima, which conflict with one

another regarding key aspects of the traffic stop, most notably that Mr. Lima opened the glove compartment to get his registration and then someone locked it again before the police began searching the car. Considering the evidence in the light most favorable to the Prosecution, we conclude a reasonable fact-finder could have found all the essential elements of these offenses beyond a reasonable doubt. The evidence is thus legally sufficient to support the convictions. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of both offenses beyond a reasonable doubt.

### 2. *Wrongful use of marijuana*

In Specification 3 of Charge I, Appellant was convicted of wrongful use of marijuana, in connection with his positive urinalysis result for the THC metabolite. In order to prove this offense, the Government was required to prove beyond a reasonable doubt that (a) Appellant used marijuana; and (b) his use of marijuana was wrongful. *MCM*, pt. IV, para. 37.b.(2).

> Knowledge of the presence of the controlled substance is a required component of use . . . [which] may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge.

*MCM*, pt. IV, para. 37.c.(10); *see also United States v. Green*, 55 M.J. 76, 81 (C.A.A.F. 2001) ("A urinalysis . . . when accompanied by expert testimony [interpreting the test] . . . provides a legally sufficient basis . . . to draw the permissive inference of knowing, wrongful use.").

Appellant argues that the evidence supports a reasonable theory of innocent ingestion. He points to the fact that he underwent a second urinalysis one day after his first urinalysis, the results of which were negative, and that the Government's expert testified that the results of the urinalyses were consistent with a single use of marijuana. He also points to his testimony in which he described feeling sick after eating chicken and lasagna at a party a week or so prior to the urinalysis.

We find these arguments unpersuasive. The permissive inference alone is sufficient to support a conviction for wrongful marijuana use based on a positive urinalysis result where the level of THC metabolite, as here, is consistent with knowing use. The evidence additionally reveals that Appellant was riding in a car that smelled of marijuana and that he knew had a large quantity of marijuana in its glove compartment, immediately prior to the urinalysis in question. Considering the evidence in the light most favora-

ble to the Prosecution, we conclude a reasonable fact-finder could have found all the essential elements of this offense beyond a reasonable doubt. The evidence is thus legally sufficient to support the conviction. Regarding factual sufficiency, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## C. Sentence Reassessment

Having set aside one of Appellant's convictions, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure; (2) whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

Here, we determine that we can reassess the sentence. As the Article 92 conviction comprised only two years of the maximum sentence of 37.5 years' confinement, there has been no dramatic change in the penalty landscape or exposure. Appellant was sentenced by a military judge, and the nature of the remaining offenses captures the gravamen of his criminal conduct and does not significantly alter the circumstances of the offenses relevant to sentencing. Finally, the remaining offenses are of the type with which appellate judges have experience to reliably determine what sentence would have been imposed at trial. Under these circumstances, we are confident that the sentence the military judge would have imposed for the remaining offenses would be the same as the one he originally adjudicated.

## D. Sentence Appropriateness

Appellant asserts that his sentence including a bad-conduct discharge [BCD] is inappropriately severe given that he was previously sexually assaulted, his PTSD diagnosis, and the nature of the offenses of which he was found guilty. We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires an "individualized consideration of the particular ac-

cused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). We have significant discretion in determining sentence appropriateness, but may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

We find the sentence appropriate in this case. Appellant was convicted of multiple drug-related offenses including using marijuana; conspiring with another to possess, introduce, and distribute it; and introducing a large quantity of it onto a military installation with the intent to distribute it. The Defense submitted evidence of Appellant's pre-existing PTSD diagnosis, character letters and testimony, and an unsworn statement in which Appellant discussed his mental health issues after being sexually assaulted at a prior duty station. Based on the evidence, and giving individualized consideration to Appellant as well as the nature and seriousness of the offenses, we find that the sentence including a BCD serves the interests of justice and that Appellant received the punishment he deserves.

### E. Error in the Promulgating Order

The Government concedes Appellant's claim that the court-martial order [CMO] does not accurately reflect that, in response to a Defense motion under RCM 917, the military judge found Appellant not guilty of wrongful manufacture of marijuana with intent to distribute under Specification 4 of Charge I. Although we find no prejudice from this apparent scrivener's error, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). Accordingly, we order correction of records in this case to accurately reflect the finding as to this specification.

## III. CONCLUSION

Appellant's conviction under Charge II is **SET ASIDE**. The supplemental CMO will accurately reflect that Appellant was acquitted of Specification 4 of Charge I. The remaining findings and the sentence are **AFFIRMED**.

Judges STEWART and HOUTZ concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court